**McGANN MFG. CO., Inc., et al. v.
UNITED STATES et al.**

Civ. A. No. 3233.

United States District Court
M. D. Pennsylvania.

July 6, 1951.

See also D. C., 87 F.Supp. 983.

Caldwell, Fox & Stoner, by Thomas D. Caldwell, and Maurice Yoffee, Harrisburg, Pa., Fisher, Ports & May, of Ralph F. Fisher, York, Pa., Charles J. Margiotti, Pittsburgh, Pa., for petitioner.

Arthur A. Maguire, U. S. Att., Scranton, Pa., Howard C. Wood, Department of Justice, Washington, D.C., for defendants.

WATSON, Chief Judge.

This is a petition by the McGann Manufacturing Company, Inc. for an equitable determination praying for relief from alleged losses suffered in performance of contracts and subcontracts with the United States during World War II. The action is brought under the War Contracts Hardship Claims Act, Public Law 657, 79th Cong., 2nd Sess., Ch. 864, 60 Stat. 902, as amended by Section 37 of Public Law 773, 80th Cong., 2nd Sess., 41 U.S.C.A. § 106 Note, also known as the Lucas Act (hereinafter referred to as the Act). The case was tried by the Court without a jury.

Petitioner's claim is for alleged losses under contracts with the United States Maritime Commission for the manufacture of steam winches, designated MCc–30641 and MCc–35480; under a subcontract with Dravo Corporation for the fabrication of box sections and flat work for LSTs issued by Dravo under its prime contract with the United States Navy, designated NObs–1312; under a contract with the United States Maritime Commission for the manufacture of electric winches, designated MCc–29292; and for estimated collection costs.

Petitioner has conceded in its brief that it cannot recover reimbursement for alleged losses sustained in performance

of the Maritime steam winch contract because it did not comply with Section 3 of the Act, which limits claims for losses to those with respect to which a written request for relief was filed with the department or agency concerned on or before August 14, 1945. The phrase "written request for relief" as it appears in Section 3 of the Act has been construed by the United States Supreme Court in the case of Fogarty v. United States, 1950, 340 U.S. 8, 71 S.Ct. 5, to mean written notice presented prior to August 14, 1945, to an agency which was authorized to grant relief under Section 201 of the First War Powers Act, 50 U.S.C.A. Appendix, § 611. Petitioner concedes that such written notice of the claim under the Maritime steam winch contract was not given. Petitioner's claim under this contract should be denied.

Petitioner's claim for alleged losses sustained in the performance of the Dravo subcontract must be examined in the light of another limitation to recovery contained in Section 1 of the Act, wherein it is provided, inter alia, that equitable claims for losses should be settled where the losses were incurred without fault or negligence on the part of the contractors or subcontractors in the performance of such contracts or subcontracts.

It appears from the evidence that petitioner sought the subcontract from Dravo Corporation, representing that it had adequate facilities and personnel available to do the work. Petitioner bid for the subcontract on the basis of producing 159 tons per week of fabricated steel at a price of $115 per ton for fabrication of box sections and flat work, unpainted. Petitioner never lived up to this schedule. According to the testimony of an expert, the price under the subcontract was fair.

Petitioner contended throughout the trial that one of the main causes of its loss on the Dravo subcontract was the lack of "know-how" assistance from the Dravo Corporation. It appears that prior to the granting of the subcontract, officials of petitioner met with officials of the Dravo Corporation at the Dravo plant at which time the Dravo officials explained the work to be done and gave petitioner's officials opportunity to examine similar work in progress. The subcontract contained no promise by Dravo to give petitioner "know-how" assistance. Nevertheless, petitioner's officials were free to visit the Dravo plant and observe similar work during the course of the subcontract. Petitioner conceded that Dravo did send to petitioner's plant Ray Quain, an employee of the Dravo mold lift, to aid in making wooden templates for use in the performance of the subcontract. Petitioner further conceded that James F. Mahon, a Dravo inspector, was permanently stationed at petitioner's plant during the performance of the subcontract. Defendant's Exhibit X, a letter of May 23, 1944, from petitioner by William J. Kuntz, president and general manager of petitioner, to Dravo Corporation, acknowledged Dravo Corporation's "continued cooperation". "Know-how" assistance from the Dravo Corporation was adequate under the circumstances, and in any event its lack was not a cause of petitioner's loss on the Dravo subcontract.

Petitioner further contended that one of its causes of loss on the subcontract was delay by the Dravo Corporation in delivering steel, drawings and shop bills. The fact is that Dravo fully complied with the terms of the subcontract as to delivery of steel, drawings and shop bills, except for a delay by Dravo in the delivery of steel at the beginning of the term of the subcontract. This delay by Dravo was cured by March 31, 1944, and to compensate for it Dravo extended the date on which petitioner was to make the first delivery of the fabricated steel. There were no further delays by Dravo and Dravo received no complaints from petitioner about delays after March 15, 1944. Petitioner did not meet the extended delivery date and soon fell so far behind the delivery schedule that Dravo and petitioner agreed to reduce the rate of petitioner's required shipments. Petitioner never completed work as required by the subcontract. The work to be done by petitioner consisted of fabricating flat work and box sections. The box sections were more costly to fabricate, and it appears that petitioner completed more flat work than box sections. There was no de-

lay by Dravo Corporation which caused petitioner's loss under the subcontract.

One of the main causes of petitioner's inability to perform and resulting loss under the Dravo subcontract was its failure to obtain adequately trained supervisory and other personnel. When petitioner was negotiating for the Dravo subcontract, it knew of the scarcity of labor created by World War II. It appears that the entire LST program was set up so that trained shipbuilders were not necessary to do the work properly. During the course of the performance of the Dravo subcontract, petitioner made very frequent changes in its supervisory personnel. This resulted in improper supervision throughout the plant, leaving employees in the position of not knowing what to do and creating general apathy among the employees. In this connection, the testimony showed that employees were found asleep numerous times during working hours. These frequent changes in supervisory personnel also resulted in lack of coordination of the various stages of the work and the failure of supervisors to be willing to make final decisions with respect to the completion of stages of the work. An example of incompetent supervision during performance of the Dravo subcontract was the hiring of a Mr. Blackmar, who was placed in charge of the structural or plate shop for about four months. Mr. Blackmar admitted to James F. Mahon that he did not know anything about structural or plate shop work. Mr. Blackmar was unable to answer questions of his employees and to properly assign jobs to them. Another example of incompetent supervision was the hiring of a Mr. Zimmerman who was placed in charge of the welding section. It appears that Mr. Zimmerman was not familiar with standard welding symbols or procedures. Welders themselves were frequently replaced creating further confusion in the welding section of petitioner's plant. The evidence also shows that other supervisors were incompetent. Evidences of inadequately trained personnel are shown by testimony concerning the operation of a night shift at petitioner's plant during the course of the work on the Dravo subcontract. Mistakes made by the untrained night shift caused the day shift endless delay and duplication of work. The evidence also shows that untrained personnel improperly marked steel for cutting, causing imperfections in the finished product.

Another major cause of petitioner's inability to perform and resulting loss under the Dravo subcontract was its failure to circulate promptly to its various shops revisions in the drawings and shop bills sent by Dravo. This failure necessitated frequent changes after completion of a phase of the work and caused confusion and additional expense. Dravo officials suggested a speedup in circulation of these drawings and shop bills but nothing was done by petitioner's officials to remedy the situation.

Another cause of petitioner's inability to perform and resulting loss under the Dravo subcontract was its lack of adequate equipment. An outstanding example of this inadequacy was the frequent breakdown of cranes needed at all times by petitioner to complete work on the LST sections. These breakdowns occurred frequently and caused considerable delay and additional cost.

■ The losses allegedly incurred by petitioner in performance of the subcontract with the Dravo Corporation for the fabrication of box sections and flat work for LSTs issued by Dravo under its prime contract with the United States Navy, designated NObs–1312 were incurred because of fault and negligence on the part of petitioner in the performance of the subcontract.

Petitioner's claim for alleged losses sustained in the performance of the contract with the United States Maritime Commission for the manufacture of electric winches complies with the Act's requirements for recovery.

■ Notice of the loss under said contract was given to the U. S. Maritime Commission by petitioner by letter dated April 12, 1945 (Exhibit 4 of Petitioner's Exhibit 9, N. T. 192), and the U. S. Maritime Commission acknowledged receipt of said notice on April 24, 1945 (Exhibit 5 of Petitioner's Exhibit 9). In Forgarty v.

U. S., supra, Mr. Justice Minton of the U. S. Supreme Court, in referring to the term "written request for relief" as it appears in Section 3 of the Act, stated, inter alia: "Since there is no definition of the term in the Act or regulations, and since the legislative history of the Act does not show that any settled usage of the term was brought to the attention of Congress, no particular form of notice is required. But whatever the form of notice, it must be sufficient to apprise the agency that it was being asked to grant extra-legal relief under the First War Powers Act for losses sustained in the performance of war contracts." [340 U.S. 8, 71 S.Ct. 8.] Petitioner's letter dated April 12, 1945, meets the test of this language.

■■ Defendant contends that Petitioner cannot recover alleged losses under the electric winch contract because of Paragraph 204 of Executive Order 9786, which provides, in part, as follows: "No claim shall be considered if final action with respect thereto was taken on or before that date (August 14, 1945)." It appears from the evidence that the U. S. Maritime Commission, following petitioner's requests of April, 1945, did increase the contract price on the electric winch contract. Although this fact would appear to place the situation under Executive Order 9786, such an argument ignores Section 3 of the Act itself which provides, in part, as follows: "But a previous settlement under the First War Powers Act, 1941, or the Contract Settlement Act of 1944 shall not operate to preclude further relief otherwise allowable under this Act." It is fundamental that the provisions of the Executive Order are not controlling insofar as they may be inconsistent with the Act itself. Judge Holtzoff, referring to this problem in Warner Construction Co. v. Krug, Secretary of the Interior, D.C.D.C., 1948, 80 F.Supp. 81, 84, set forth clearly the guiding principles, as follows: "Insofar as Sections 204 or 307 of the rules and regulations promulgated under the statute may be inconsistent with Section 3 of the Act, these regulations must be deemed invalid. It is elementary law that executive regulations promulgated for the purpose of carrying a statute into effect must be within the framework of the Act and may not be inconsistent with the statute." See, also, Howard Industries, Inc., v. U. S., 1949, 113 Ct.Cl. 231, 83 F.Supp. 337. Applying the same rule in the present case, petitioner is not barred from recovery for alleged losses under the electric winch contract because of the above quoted portion of Paragraph 204 of Executive Order 9786.

Further there was no competent evidence produced by the defendant to establish that petitioner's alleged losses incurred in performance of the electric winch contract were incurred because of fault and negligence on the part of petitioner in the performance of the contract.

■ The contract price for work performed by petitioner on the electric winch contract was $843,930.16. To determine petitioner's loss, it is necessary to fix the petitioner's total cost of performance on the electric winch contract from May 12, 1944, the date on which the contract was commenced, to August 14, 1945, the date to which recovery is allowed under the Act. The difference between petitioner's cost of performance on the electric winch contract and the amount to be received under the terms of the electric winch contract represents the loss on the electric winch contract, which petitioner is entitled to recover under the Act.

Numerous difficulties are presented in this case in fixing petitioner's cost of performance on the electric winch contract. The testimony of the accountants of petitioner and defendant did not break down petitioner's total costs so as to show the portion properly allocable to the electric winch contract, or the portion properly allocable to the period in question. It further appears that all of the original records of the petitioner are no longer readily accessible, if actually complete, because of a fire which occurred in petitioner's factory. The final difficulty was in a lack of agreement between the testimony of accountants as to what expenses of the petitioner should be included as costs of performance of the electric winch contract.

The petitioner did agree during the course of the trial that certain items of its total overhead listed in its original claim should be reduced or deleted entirely.

230

These include certain costs for machinery and equipment repairs, a portion of the depreciation expenses, accelerated depreciation expenses, part of the officers' salaries, donations, certain costs of plant supplies, and certain machinary rentals. After careful consideration of all the evidence, it is the opinion of the Court that further reductions and deletions in the total overhead costs must be made in order to arrive at the actual total overhead. These include experimental and research expenses in the sum of $3,858.24; accelerated depreciation expenses for the period in question during 1944 in the sum of $3,048.21 and for the period in question during 1945 in the sum of $4,670.50; and the officers' salaries which must be reduced for the period in question during 1944 in the sum of $10,700 and for the period in question during 1945 in the sum of $6,899.86, bringing them to the amounts allowed by the Internal Revenue Department for tax purposes.

After making reductions and adjustments on such bases, the petitioner's adjusted total overhead for the period from April 30, 1944, to December 31, 1944, is $231,303.55. For the purpose of determining petitioner's net loss on the electric winch contract, the next necessary step is to determine what portion of the total adjusted overhead during this period in 1944 is properly allocable to the electric winch contract. From an accounting standpoint, with the records available in this case, the fairest basis for allocating the applicable portion of overhead is by comparison of the total overhead and the total direct labor costs. The petitioner's total direct labor cost for the period from April 30, 1944, to December 31, 1944, is $276,250.20, making the total overhead for said period 83.72% of the total direct labor cost. Applying this percentage to the cost of direct labor for said period in 1944 on the electric winch contract which is $29,906.84, the portion of overhead allocable to the electric winch contract is 83.72% of $29,906.84, or $25,038.01, for the period from April 30, 1944, to December 31, 1944. Using the same method to determine the portion of overhead allocable to the electric winch con-

tract for the period from January 1, 1945, to November 30, 1945, which is the only period for which these figures are broken down, the result is as follows: Total adjusted overhead, $381,230.56; total direct labor cost, $283,780.92; total overhead percentage of total direct labor, 134.54%; direct labor cost on the electric winch contract, $116,391.90; and portion of overhead allocable to electric winch contract, 134.54% of $116,391.90, or $156,593.66.

With these figures established, petitioner's total cost of performance on the electric winch contract for the period from April 30, 1944, to November 30, 1945, is obtained by adding the amounts of the following items: Outside purchases, $524,639.12; labor during the period involved in 1944, $29,906.84; overhead during the period involved in 1944, $25,038.01; labor during the period involved in 1945, $116,391.90; overhead during the period involved in 1945, $156,593.66; tools, jigs and fixtures, $20,675.46; machinery rentals $11,975.93; and related shop orders, $5,170.80; or a total cost of performance of $890,391.72.

The contract price on the electric winch contract was $843,980.16, which shows a difference in the total cost of performance and the amount to be received under the terms of the electric winch contract of $46,461.56, or the net loss for the period covered by the records examined. This net loss is based on records running to November 30, 1945, but Section 1 of the Act provides that the only recoverable losses are those incurred up to August 14, 1945, so clearly petitioner's losses incurred between August 14, 1945, and November 30, 1945, are not recoverable under the Act. After careful consideration of all the evidence, and proper accepted accounting procedure, it is the opinion of the Court that about one-eighth of the above loss or $5,807.70 was incurred by petitioner after August 14, 1945. When the net loss to November 30, 1945 is reduced by this amount, the net loss recoverable under the Act is $40,653.86.

The defendants contend that petitioner is entitled to no recovery because of

a further limitation contained in Section 2 (a) of the Act to the effect that no amount shall be allowed "in excess of the amount of the net loss * * * on all contracts and subcontracts held by the claimant under which work, supplies, or services were furnished for the Government between September 16, 1940, and August 14, 1945 * * *." Defendant contends that in order to comply with the Act in this regard, petitioner should have brought into Court all records pertaining to each of the sixty-nine contracts petitioner had for government work and should have introduced the costs of each into evidence item by item. It is evident from a practical standpoint and from the condition of these records after the fire at petitioner's factory that such a method of complying with Section 2 of the Act could never have been intended in a situation such as the present one. Petitioner presented proof of a net loss by another method, which appears to be satisfactory under the circumstances. This proof was had by an analysis of each of petitioner's private commercial contracts, which constituted 5.43% of petitioner's total business, showing the cost of performance of said private commercial contracts. The difference between the costs of performance and the net loss or profit sustained on the said private commercial contracts, and the total costs of performance and total net loss or profit sustained from both private and government contracts represented the costs of performance and the loss or profit sustained on government contracts. From this proof it was clear that the net loss to petitioner on all government contracts held by it during the period involved far exceeded the net loss on the electric winch contract. Petitioner is not barred from recovery for its losses under the electric winch contract because of the provisions of Section 2(a) of the Act.

Petitioner also seeks to recover $58,906.35 representing repair and over, short and damage claims held against petitioner by the United States Maritime Commission. The sum cannot be recovered by petitioner herein because there is no evidence as to petitioner's liability.

If petitioner is liable for these charges, then they were incurred through its own fault and negligence for which no recovery may be had under the Lucas Act.

Petitioner further claims the sum of $49,417.26 for costs incurred in preparing and processing these claims to settlement. Of this sum, it appears from the evidence that $16,011.40 was incurred in preparing and processing petitioner's claim under its subcontract with Dravo before August 14, 1945. Because petitioner is entitled to no recovery under the Act for its losses under the Dravo subcontract, petitioner can recover nothing for the cost of preparing and processing its claim for losses thereunder. The remaining $33,405.86 claimed, covers costs for preparing and processing claims under the contracts with the U. S. Maritime Commission for steam winches, and the subcontract with Dravo, as well as the contract with the U. S. Maritime Commission for electric winches. Only the portion of the claim which applies to preparing and processing the claim under the electric winch contract could be recovered in this proceeding. Pro-rating the claim on the basis of sales under the electric winch contract as compared with sales under the three contracts covered by the claim, it appears that 48.04% of the estimated costs of collection are properly attributable to the electric winch contract. On this basis (48.04% of $33,405.86), petitioner is entitled to recover $16,048.18 for costs incurred in preparing and processing the claim under the electric winch contract. Defendant contends that petitioner is not entitled to any collection costs under the Act. This contention is without merit in view of the language used in Section 6 of the Act, where it is provided, inter alia: " * * * the court, sitting as a court of equity, shall have jurisdiction to determine the amount, if any, to which such claimant and petitioner may be equitably entitled * * *."

It was contended by the petitioner and by witnesses who testified on behalf of the petitioner that there is due the petitioner from the Dravo Corporation the sum of $32,002.27, and from the U. S. Maritime Commission the sum of $94,886.54. These

sums together with proper interest should be paid by the Dravo Corporation and the U. S. Maritime Commission to the trustee of the McGann Manufacturing Company, Inc., forthwith, but as these claims are not now properly before this Court, they will not be included in the Court's decree with reference to the payment of the loss sustained by the McGann Manufacturing Company, Inc. as set forth in the foregoing opinion and the findings of fact and conclusions of law by this Court, but should be paid to the trustee of the McGann Manufacturing Company, Inc. in addition to the amount set forth in the Court's decree.

The petitioner, McGann Manufacturing Company, Inc. is entitled to reimbursement in the sum of $40,653.86 for losses incurred under its contract with the U. S. Maritime Commission for the manufacture of electric winches, and in addition the sum of $16,048.18 for costs incurred in preparing and processing said claim, or a total of $56,702.04. Findings of fact, conclusions of law, and an order directing the U. S. Maritime Commission to settle the claim in accordance with the findings of the Court will be filed forthwith.