**RELTOOL SERVICE CO.**
v.
**UNITED STATES.**
No. 49474.
United States Court of Claims.
April 6, 1954.

Raymond C. Cushwa, Washington, D. C., for plaintiff. George D. Webster and Davies, Richberg, Tydings, Beebe & Landa, Washington, D. C., were on the briefs.

Carl Eardley, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Donald D. Webster, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

JONES, Chief Judge.

The plaintiff sues for $111,052.56, which allegedly represents losses incurred in the performance of a subcontract under a prime contract with the government for the production of 60 *mm*. shells. The suit is based on the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 992, 41 U.S.C.A. § 106 note. The plaintiff is referred to hereinafter as Plasco, the name by which it was known during the contract period involved.

The issue presented by this case is whether the provision of the Lucas Act restricting recoverable losses to those "incurred * * * without fault or negligence on [the part of a plaintiff] in the performance of such contracts or subcontracts [with the government]", precludes recovery by this plaintiff. For reasons set out in detail in our findings and summarized below, we hold that plaintiff is so precluded.

Plasco Company was originally a partnership which was formed in 1942 by Carl Hofmeier, Henry Maykemper and N. Halperin. This partnership was engaged in experimenting with methods of forgings which were new in the United States. In August 1943, Henry M. Blume, a lawyer engaged in the promotion of business enterprises, and Stanley Evans purchased Halperin's interest in the partnership. On August 25, 1943, Mr. Blume went to Washington, D. C., and conferred with officers of the Ordnance Division of the Army regarding the use of forgings in the production of 60 *mm*. shells. He was encouraged by his reception and the possibilities of participating in the preparedness program. The following month the partners formed the corporation known as Plasco Steel Works, Inc., with common stock divided among the partners. Mr. Blume was made president of Plasco.

Upon being informed by Mr. Blume that Plasco was able to engage in the production of shell forgings, Ordnance authorities investigated Plasco's facilities and reported on November 9, 1943, that while Plasco had produced a satisfactory forging, it would need financing, equipment and a new plant before it could engage in intensive production.

In November and December 1943, the Goslin-Birmingham Manufacturing Company of Birmingham, Alabama (hereinafter Goslin-Birmingham), entered a contract with the War Department to supply 1,100,000 shells, high explosive, 60 *mm*. The contract delivery schedule required 10,000 shells in February 1944; 60,000 in March 1944; 145,000 in April 1944 and each month thereafter through September 1944; 160,000 in October 1944, completing deliveries by the end of that month. After ascertaining that no known supplier of 60 *mm*. rough forgings could furnish any for this contract, Goslin-Birmingham learned from Ordnance that Plasco had indicated its capability for producing them. Goslin-Birmingham contacted Plasco and was informed that the latter was engaged in constructing dies for sample 60 *mm*. shells and that upon securing satisfactory samples, Plasco would notify Goslin-Birmingham. On December 30, 1943, Plasco wrote that with present equipment it could make 50,000 rough forgings per month. If it decided upon expansion of facilities, Plasco expected to produce 100,000 to 150,000 per month without heat treating or sand blasting. Two sample 60 *mm*. forgings were sent to Goslin-Birmingham. It was the latter's understanding that these samples were made by the method which would ultimately produce volume forgings. Actually, the samples were hand produced.

Following various negotiations Goslin-Birmingham, on January 15, 1944, formally agreed to purchase from Plasco 1,100,000 rough forgings in accordance with Army specifications, at a price of 35 cents per forging, with monthly shipments to be equally distributed between January and October 1944. Goslin-Bir-

mingham supplied Plasco with 816 tons of steel for the forgings.

When Plasco entered into this agreement its equipment consisted of two presses in rather poor shape and a round table. Three presses, three furnaces, and an air compressor were added later. Plasco initially proposed to make the forgings by mounting six dies on the table under a press after initial heating. However, after trial it was found that this method was wholly inadequate and the idea was abandoned. The forgings actually shipped by Plasco were forged by using two dies under a press, then cooled, cut and reheated to complete the processing.

From the outset Plasco experienced difficulty in producing acceptable forgings. The forgings failed to conform to specifications and were eccentric instead of concentric. These eccentric forgings snarled the production operation of Goslin-Birmingham, broke the mandrels and cutting tools on its production line, and slowed the output of finished shells.

Goslin-Birmingham attempted to aid Plasco by supplying both technical advice and financial assistance. In May 1944, when Plasco for the first time requested a price increase, the prime contractor raised the price per forging from 35 cents to 38½ cents and later in the same month advanced $5,000 to enable Plasco to meet current obligations.

Internal dissension in the Plasco organization, together with inadequate machinery, slowed forging output. Plasco failed to check its equipment properly and to correct apparent defects as they arose in the forging operations. Careless press operation and the use of improper forging practices contributed greatly to the delays in production. Despite constant warnings by the prime contractor, plaintiff's president insisted upon shipping forgings which its own inspector declared faulty.

Plasco's first shipment of rough forgings to Goslin-Birmingham was not made until April 12, 1944, and small shipments continued thereafter up to June 19, 1944. At no time did the shipments approximate the scheduled quantity of over 100,000 per month. Despite production difficulties, plaintiff continued to present an optimistic picture to both the prime contractor and Ordnance regarding future deliveries. Although Goslin-Birmingham could use only quality forgings in accordance with specifications, out of a total of 44,779 forgings dispatched only 6,700 were acceptable. Payment was made to plaintiff for every forging received whether acceptable or not.

When Goslin-Birmingham declined to make any further advance to Plasco in June 1944, plaintiff ceased all operations because of lack of funds.

Plaintiff's inability to produce dimensionally correct forgings in quantity was due to (1) inadequate technical management, (2) improper plant facilities and equipment, (3) financial instability, (4) interference by unskilled managers with technical plant operations, and (5) failure to adhere to proper forging methods.

In view of the above facts which are set out in more detail in our findings, we are impelled to the conclusion that plaintiff's losses were not "incurred * * * without [its] fault or negligence." It follows that plaintiff is precluded recovery here. Howard Industries, Inc. v. United States, 115 F.Supp. 481, 113 Ct. Cl. 231; McGann Mfg. Co., Inc., v. United States, D.C., 98 F.Supp. 225.

The petition is dismissed.

It is so ordered.

MADDEN, WHITAKER and LITTLETON, Judges, concur.