JoNes, Chief Judge,
delivered the opinion of the court:
The plaintiff sues for $111,052.56, which allegedly represents losses incurred in the performance of a subcontract under a prime contract with the government for the production of 60 mm. shells. The suit is based on the Lucas Act, 60 Stat. 902, 41 U. S. C. 106 note, as amended, 62 Stat. 992. The plaintiff is referred to hereinafter as Plasco, the name by which it was known during the contract period involved.
The issue presented by this case is whether the provision of the Lucas Act restricting recoverable losses to those “incurred * * * without fault or negligence on [the part of a plaintiff] in the performance of such contracts or subcontracts [with the government],” precludes recovery by this plaintiff. For reasons set out in detail in our findings and summarized below, we hold that plaintiff is so precluded.
Plasco Company was originally a partnership which was formed in 1942 by Carl Hofmeier, Henry Maykemper and N. Halperin. This partnership was engaged in experimenting with methods of forgings which were new in the United States. In August 1943, Henry M. Blume, a lawyer engaged in the promotion of business enterprises, and Stanley Evans purchased Halperin’s interest in the partnership. On August 25, 1943, Mr. Blume went to Washington, D. C., and conferred with officers of the Ordnance Division of the Army regarding the use of forgings in the production of 60 mm. shells. He was encouraged by his reception and the possibilities of participating in the preparedness program. The following month the partners formed the corporation known as Plasco Steel Works, Inc., with common stock divided among the partners. Mr. Blume was made president of Plasco.
Upon being informed by Mr. Blume that Plasco was able to engage in the production of shell forgings, Ordnance authorities investigated Plasco’s facilities and reported op November 9, 1943, that while Plasco had produced a satisfactory forging, it would need financing, equipment and a. new plant before it could engage in intensive production.
In November and December 1943, the Goslin-Birmingham Manufacturing Company of Birmingham, Alabama (hereinafter Goslin-Birmingham), entered into a contract with the *16 War Department to supply 1,100)000 shells, high, explosive, 60 mm. The contract delivery schedule required 10,000 shells ■in February 1941; 60,000 in March 1944; 145,000 in April 1944 and each month thereafter through September 1944; 160,000 in October 1944, completing deliveries by the end of that month. After ascertaining that no known supplier of 60 mm. rough forgings could furnish any for this contract, Gos-lin-Birmingham learned from Ordnance that Plasco had indicated its capability for producing them. Goslin-Birmingham contacted Plasco and was informed that the latter was engaged in constructing dies for sample 60 mm. shells and that upon securing satisfactory samples, Plasco would notify Gos-din-Birmingham. On December 30, 1943, Plasco wrote that Hvith present equipment it could make 50,000 rough forgings per month. If it decided upon expansion of facilities, Plasco expected to produce 100,000 to 150,000 per month without heat treating or sand blasting. Two sample 60 mm. forgings were sent to Goslin-Birmingham. It was the latter’s understanding that these samples were made by the method which would ultimately produce volume forgings. Actually, the samples were hand produced.
■ Following various negotiations Goslin-Birmingham, on Januáry 15, 1944, formally agreed to purchase from Plasco 1,100,000 rough forgings in accordance with Army specifications, at a price of 35 cents per forging, with monthly shipments to be equally distributed between January and October 1944. Goslin-Birmingham supplied Plasco with 816 tons of steel for the forgings.
When Plasco entered into this agreement its equipment consisted of two presses in rather poor shape and a round table. Three presses, three furnaces, and an air compressor were added later. Plasco initially proposed to make the ■forgings by mounting six dies on the table under a press 'after initial heating. However, after trial it was found that this method was wholly inadequate and the idea was abandoned. The forgings actually shipped by Plasco were forged ■by using two dies under a press, then cooled, cut and reheated to complete the processing.
From the outset Plasco experienced difficulty in producing 'acceptable forgings. The forgings failed to conform to *17 specifications and were eccentric instead of concentric. These eccentric forgings snarled the production operation of Goslin-Birmingham, broke the mandrels and cutting tools on its production line, and slowed the output of finished shells.
Goslin-Birmingham attempted to aid Plasco by supplying both technical advice and financial assistance. In May 1944, when Plasco for the first time requested a price increase, the prime contractor raised the price per forging from 35 cents to 38% cents and later in the same month advanced $5,000 to enable Plasco to meet current obligations.
Internal dissension in the Plasco organization, together with inadequate machinery, slowed forging output. Plasco failed to check its equipment properly and to correct apparent defects as they arose in the forging operations. Careless press operation and the use of improper forging practices contributed greatly to the delays in production. Despite constant warnings by the prime contractor, plaintiff’s president insisted upon shipping forgings which its own inspector declared faulty.
Plasco’s first shipment of rough forgings to Goslin-Birm-ingham was not made until April 12, 1944, and small shipments continued thereafter up to June 19,1944. At no time did the shipments approximate the scheduled quantity of over 100,000 per month. Despite production difficulties, plaintiff continued to present an optimistic picture to both the prime contractor and Ordnance regarding future deliveries. Although Goslin-Birmingham could use only quality forgings in accordance with specifications, out of a total of 44,779 forgings dispatched only 6,700 were acceptable. Payment was made to plaintiff for every forging received whether acceptable or not.
When Goslin-Birmingham declined to make any further advance to Plasco in June 1944, plaintiff ceased all operations because of lack of funds.
Plaintiff’s inability to produce dimensionally correct forgings in quantity was due to (1) inadequate technical management, (2) improper plant facilities and equipment, (3) financial instability, (4) interference by unskilled managers with technical plant operations, and (5) failure to adhere to proper forging methods.
*18 In view of tbe above facts which are set out in more detail in our findings, we are impelled to the conclusion that plaintiff’s losses were not “incurred * * * without [its] fault or negligence.” It follows that plaintiff is precluded recovery here. Howard Industries, Inc. v. United States, 113 C. Cls. 231; McGann Mfg. Co., Inc. v. United States, 98 F. Supp. 225. The petition is dismissed.
It is so ordered.
' MaddeN, Judge; Whitaker, Judge, and LittletON, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes the following findings of fact:
1. The plaintiff, Reltool Service Company, is a corporation organized under the laws of the State of Wisconsin, having its principal place of business in Milwaukee, Wisconsin. The plaintiff hereafter is referred to as Plasco, the name by which it was known during the contract period involved.
2. A partnership called Plasco Company was originally formed in 1942, composed of Carl Hofmeier, Henry May-kemper and N. Halperin. It was engaged in experimenting with methods of forging which were new to the United States. In August 1943, Henry M. Blume and Stanley Evans purchased Halperin’s interest, and in September, 1943, formed the corporation known as Plasco Steel Works, Inc. with common stock divided between Hofmeier, Maykemper, Evans, and Blume. The charter of incorporation was amended in 1945 to change the firm name to Reltool Service Company.
3. On August 25, 1943, Mr. Blume went to Washington, D. C., and conferred with several officers of the Ordnance Division of the Army regarding the use of forgings in the production of 51 mm. and 60 mm. shells. He was encouraged by his reception and the possibilities of participating in the preparedness program. On November 5,1943, Blume informed the Ordnance Division of the Army in Chicago, Illinois, that Plasco was able to engage in production of forgings for 57 mm. shells, desired to do so, and invited inspection of its facilities.
*19 4. The Milwaukee suboffice of the Ordnance District investigated Plasco’s facilities and made a report on November 9, 1943. This report, in substance, was that Plasco Steel Works was actually an experimental laboratory which had produced a satisfactory forging, but before it could do any intensive production it would need financing, equipment, and a new plant in a different location which would permit line production.
5. The Goslin-Birmingham Manufacturing Company, of Birmingham, Alabama, hereinafter called Goslin-Birming-ham, entered into a letter contract with the War Department acting through the Birmingham Ordnance District, on November 30, 1943, followed by a more formal contract dated December 30, 1943, to supply 1,100,000 shells, high explosive, 60 mm. The contract delivery schedule required 10,-000 shells in February 1944; 60,000 in March 1944; 145,000 in April 1944 and each month thereafter through September 1944; 160,000 in October 1944, completing deliveries on October 31, 1944. Upon receipt of a letter of intent from the Office of the Chief of Ordnance, Birmingham, Alabama, dated November 11, 1943, and after ascertaining that all known suppliers of 60 mm. rough forgings were unable to furnish it any, Goslin-Birmingham learned from the Ordnance Department that Plasco had indicated it was capable of producing them. On November 19,1943, Goslin-Birming-ham contacted Plasco to ascertain its availability for supplying 60 mm. rough forgings. Plasco informed Goslin-Bir-mingham that it was engaged in constructing dies for sample 60 mm. shells to be exhibited to another prime contractor and that upon securing satisfactory samples, Plasco would notify Goslin-Birmingham. Plasco indicated an expansion of its facilities would be necessary to handle prospective business from Goslin-Birmingham.
6. On December 30, 1943, Plasco wrote that with present equipment it could make 50,000 rough forgings per month. If it decided upon expansion of facilities, Plasco expected to produce 100,000 to 150,000 per month without heat treating or sand blasting. Two sample 60 mm. forgings were also sent to Goslin-Birmingham.
*20 On December 31, 1943, the Chicago Ordnance District reported to the Birmingham Ordnance District that Plasco could produce 40,000 to 50,000 forgings (60 mm.) per month if the prime contractor furnished the material and if the operation did not include heat treating or sand blasting. ,
In answer to a wire from Goslin-Birmingham requesting the price of forgings, Plasco quoted 32 cents for the rough forging, 3 cents for the die, and 11 cents for steel, not including sand blasting or heat treating. The samples submitted by Plasco were examined by Goslin-Birmingham and the results were promptly reported. It was Goslin-Birming-ham’s understanding that the samples submitted by Plasco were made by the method which would ultimately produce volume forgings. However, the samples were actually hand processed rather than made by production-line methods.
7. After preliminary notices of its intent to place an order, Goslin-Birmingham, on January 15, 1944, formally agreed to purchase from Plasco 1,100,000 rough forgings (60 mm. bodies) in accordance with Army specifications and drawings at a price of 35 cents per forging, with shipment to be equally distributed between the months of January and October 1944. Eight hundred sixteen tons of steel for the forgings were supplied by Goslin-Birmingham which in turn expected to receive rough forgings conforming to specifications, in production quantities, within 30 to 60 days after the steel arrived at Plasco.
8. At the time Plasco entered into the agreement with Goslin-Birmingham, its equipment consisted of two presses in rather poor shape and a round table. Three presses, three furnaces, and an air compressor were later added. Plasco initially proposed to make the forging by mounting six dies on the table under a press after an initial heating. However, after trial it was found that this method, which was advocated by Maykemper, was wholly inadequate and the idea was abandoned. The forgings actually shipped by Plasco were forged by using two dies under a press, then cooled, cut, and reheated to complete the nosing or cupping operation.
9. Performance of the prime contract was under the direction of the Birmingham Ordnance District. Due to the *21 fact that Plasco, the subcontractor, was in the Milwaukee subdistrict, Birmingham requested that Milwaukee periodically check on Plasco’s operations. Pursuant to Birmingham’s request, Milwaukee directed William E. Thompson to supervise Plasco’s operations, and he visited Plasco regularly and made periodic reports. The substance of these reports was available to Goslin-Birmingham but not entirely to the plaintiff. Mr. Thompson encouraged Plasco’s efforts despite deficiencies and obstacles he thought could be overcome. Plasco did get its first production line in operation by the middle of April, which, considering it started almost from scratch, was pleasing to Thompson. What it produced, however, was not so pleasing.
10. Plasco had to conform to definite specifications as outlined in the plans and drawings for the forgings, and the dimensions of the internal cavity of the forging had to be exact. From the outset Plasco experienced difficulty in producing acceptable forgings. These rough forgings were not accepted because they failed to conform to specifications and were eccentric instead of concentric. These eccentric forgings snarled the production operation of Goslin-Bir-mingham, broke the mandrels and cutting tools on its production line, and slowed the output of finished shells.
11. Goslin-Birmingham attempted to aid Plasco in its forging operation by supplying both technical advice and financial assistance. In May 1944, when Plasco for the first time requested a price increase, Goslin-Birmingham raised the price per forging from 35 cents to 38y2 cents and later in the same month advanced $5,000 on account to enable Plasco to meet current obligations.
Sample forgings sent by Plasco to Goslin-Birmingham for examination were reported upon in detail, usually within four to five days, to enable proper adjustments to be made in Plasco’s forging process.
Detailed drawings and blueprints were supplied by Gos-lin-Birmingham to help insure adherence to proper dimensions. Dimensionally correct samples supplied by other sources were forwarded to Plasco for observation and gauge drawings and, later, even the gauges themselves were provided to Plasco by Goslin-Birmingham in an effort to secure *22 concentric forgings which, adhered to the specifications. At least one effort was made by Goslin-Birmingham before the purchase order was signed to assist Plasco in obtaining machinery.
The prime contractor also sent a technical representative to Plasco in March 1944 to help expedite production of forgings. The evidence is conflicting as to how long he stayed at Plasco for this purpose, but it is clear that whatever the length of his stay and despite his urgings that Plasco continue production notwithstanding its failures to meet specifications fully such failures continued. Eventually, this expediter quit and Goslin-Birmingham was unsuccessful in finding a replacement for him.
12. Internal dissention in the Plasco organization, together with inadequate machinery, slowed forging output. Plasco made efforts to cope with both situations. It was never entirely successful in securing adequate machinery. About 30 pieces of machinery were installed by Plasco, some new and some used. The used presses which were purchased were not properly adapted for the intended operation and had to be retooled, causing delay and imperfections. It is entirely conjectural as to whether better qualified and informed technicians working for Plasco might have found better machinery. The fact is that, acting on the information it had, Plasco got machinery it thought would do the job but it didn’t.
13. Initial production estimates by Plasco were hopeful and received as such by all parties concerned. When Plasco failed to supply forgings within a reasonable time and Goslin-Birmingham was unable to keep its delivery commitments with the Army Ordnance Department, the prime contractor sent its chief engineer to Milwaukee in February 1944 to investigate Plasco. This engineer concluded that Plasco could not produce successfully because it lacked the organizational set-up, equipment, and technical ability to produce dimensionally correct forgings in quantity. In March 1944, the President of Goslin-Birmingham visited Plasco and observed that there was a nice front office but the plant was crowded, the machines old and the facilities inadequate for a successful forging operation. However, in view of the *23 critical need for shells, the volume of steel which had already been supplied Plasco, the lack of another source of supply, financial advances made and Plasco’s promises of improvement, Goslin-Birmingham decided it was necessary to continue endeavoring to obtain rough forgings from this source.
14. The 60 mm. shell was a critical item from the very beginning of the production period involved in this case. The Ordnance Department constantly scrutinized production in the plants of both Goslin-Birmingham and Plasco and, from the various reports prepared by the Milwaukee subdistrict, Goslin-Birmingham was kept informed of Plasco’s progress. The Ordnance Department was constantly pushing Goslin-Birmingham for production of completed shells. When it became apparent that Plasco would be an inadequate source of supply, Goslin-Birmingham requested the Ordnance Department to help secure other sources for rough forgings. Eventually, Goslin-Birmingham did secure other forgings and completed its prime contract.
15. On several occasions in 1944, representatives of Plasco visited Goslin-Birmingham for the purpose of either observing shell inspection methods and the results of their shipments or to present an optimistic report on submitted samples, even though the samples were incorrect, in order that further funds could be secured from Goslin-Birmingham.
16. The first shipment of rough forgings to Goslin-Birmingham was not made until April 12, 1944,. and small shipments continued thereafter up to and including June 19, 1944. At no time did Plasco’s shipments approximate the scheduled quantity of over 100,000 per month. Plasco’s operation required a constant schedule revision. Despite production difficulties, the plaintiff continued to present an optimistic picture to both Goslin-Birmingham and the Ordnance Department regarding future deliveries. Although Goslin-Birmingham desired and could use only quality forgings in accordance with the specifications, only 6,700 forgings out of a total of 44,779 dispatched were acceptable. Payment, however, was made for every forging received whether it was acceptable or not.
*24 17. In June 1944, Plasco requested another advance from Goslin-Birmingham which in turn directed Plasco to the Smaller War Plants Administration in Milwaukee. When its request for additional funds was refused by the Administration and Goslin-Birmingham, Plasco ceased all operations on June 19,1944 because of lack of funds.
18. Plasco failed to check its equipment properly. It also failed to correct apparent defects as they arose in the forging operation and were pointed out by representatives of the •defendant and Goslin-Birmingham. The defects found in the forgings were not fully corrected because of inadequate equipment and personnel, although some efforts were made to eliminate deficiencies and some proper forgings were produced as shown above. Careless press operation and the use of improper forging practices contributed greatly to delays in the production of rough forgings. On several occasions Plasco’s failure to order an extra set of dies halted press operation. Although the nose heating of the billet was an operation which required exact heat control, Plasco neglected to employ a method of heating which would guarantee such control. Plasco’s use of improper forging procedures led to a high percentage of rej ections. Nonetheless, plaintiff’s president insisted upon shipping the rejected forgings to Goslin-Birmingham despite constant warnings. These rejects were sent by Plasco despite the fact that Plasco’s own inspector had declared them faulty. No gauges to measure all dimensions were used by Plasco prior to the arrival of Goslin-Birmingham’s chief engineer in February 1944. Even after Goslin-Birmingham furnished Plasco with gauge drawings and gauges, they were not used until late in May 1944 and sometimes not at all.
19. Plasco’s president was Mr. Henry Blume, a lawyer who left the active practice of his profession in 1933 to engage in promotion of business enterprises, in which field he enjoyed some success developing new ideas and products. He was without any technical background in forging. The friction between his subordinates over the proper method of •forging and the value of the new idea of press forging sought to be used by Plasco necessitated the interference of Mr. Blume as “boss” in resolving these difficulties. Some of these *25 subordinates were qualified and others were not. In addition, Blume took an active direct interest in plant operations,, from time to time overriding good technical advice of his-subordinates, the net effect of which was to deter the production of quality forgings.
Some of the other difficulties which beset Plasco in production of proper forgings and which contributed to its losses included the incompetence of a plant manager, failure to-make a proper cost estimate and a poor physical layout and sequence of production. Plasco’s inability to produce dimensionally correct forgings in quantity can be summarized as follows: (1) inadequate technical management, (2) improper plant facilities and equipment, (3) financial instability, (4) interference by unskilled managers with technical plant operations, and (5) failure to adhere to proper forging methods.
20. Mr. Evans and Mr. Blume organized the Pacific Midwest Corporation, which in November 1944 purchased all of the stock of Plasco and Keltool Corporation, the plaintiff herein. Plasco went out of business on June 19, 1944, sold all of its forging equipment and retained only the rights and equipment to manufacture thermo diffuser spray machines for the spraying of insecticides and other liquids.
21. On July 10,1944, Plasco wrote to the Birmingham Ordnance District calling attention to the fact that it sustained a net loss of $32,600.20 in the operation of forging mortar shells and asked that the Birmingham Ordnance District prevail upon the Chicago District to entertain a request for some relief from the loss. On June 14, 1945, Plasco filed with the Chicago Ordnance District a request for relief under the First War Powers Act alleging a net loss of $67,325.70. On June 15,1945, Plasco called the attention of the Ordnance Department in Washington, D. C., to its request for relief. Its letter read, in part, as follows:
As you will recall, we have no claim that can be presented to the General Accounting Office — probably nothing that we can assert as a matter of right, and our relief rests upon the First War Powers Act and moral considerations in that we received encouragement in this venture before going into it from high officials of the Ordnance in Washington, and we were encouraged in setting *26 up production lines from officers and officials from the Birmingham, Chicago and Milwaukee Ordnance. Districts; also, had the war been more unfavorable in its aspects than it was, the Army might have wanted these mortar shells even though they had to pay a higher cost to get them.
Our total loss was approximately $200,000; our request for relief is limited to our operating loss of $67,-325.70. At no time did we have Government aid or financial assistance, and the allowance of the request will be and has been in the furtherance of the war effort.
■ 22. On or about January 30, 1947, Plasco filed with the War Department a claim for relief under Public Law 657, 79th Congress, 2d session (Act of August 7, 1946), 60 Stat. 902, as amended by 62 Stat. 869, 992, 41 U. S. C. §106, and Executive Order 9786, dated October 5, 1946. The War Contract Hardship Claims Board denied Plasco’s claim on August 4,1949.
23. No action has been taken with respect to Plasco’s contract with Goslin-Birmingham under the Renegotiation Act, Contract Settlement Act of 1944, or similar legislation, and no relief has been granted Plasco under section 201 of the First War Powers Act of 1941. Plasco is and at all times has been the sole owner of the claim involved herein and has made no assignment or transfer thereof, or any part thereof.
24. The plaintiff’s petition claims a net loss of $111,052.56. As a result of all its war contracts, both prime and sub, plaintiff sustained an actual net loss of $86,657.46. The entire loss occurred in the performance of the 60 mm. shell contract between Plasco and Goslin-Birmingham, which was plaintiff’s only contract or subcontract for the furnishing of work, supplies, or services between September 16,1940, and August 14, 1945, to or for any department or agency of the United States. The entire loss sustained was due to its own fault and negligence in attempting to produce 60 mm. rough forgings.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover and its petition is therefore dismissed.