Littleton, Judge,
delivered the opinion of the court:
This is an action under the War Contract Hardship Claims Act, known as the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 869,992,41U. S. C. (Supp. V) § 106 note, to recover the sum of $22,713.08, alleged to represent losses incurred by plaintiff without fault or negligence on its part in the performance of a contract with the Government for the construction and delivery of four aircraft rescue boats.
The issues presented are (1) whether or not plaintiff filed a proper “written request for relief” with respect to its losses *169 within the meaning of section 3 of the Lucas Act, and (2) whether or not that portion of the Lucas Act restricting recoverable losses to those “incurred * * * without fault or negligence * * * in the performance of such contracts” precludes plaintiff’s recovery.[1]
Defendant’s motion to dismiss the petition on the ground that the petition and accompanying exhibits failed to establish that plaintiff had filed a proper written request for relief was overruled by the court. 113 C. Cls. 276. Subsequently, the decision of the Supreme Court in Fogarty v. United States, 340 U. S. 8, was announced. Defendant requested the court to reexamine its decision in the light of the Fogarty case. We deem it unnecessary to do so. We hold, for the reasons hereafter given, that plaintiff is precluded from recovery by that portion of the Lucas Act restricting recovery to losses incurred without fault or negligence of the contractor.
In May of 1941, Roy L. Brecke and Milton Polland obtained an option to buy the boatbuilding business of Ferdinand Nimphius of South Milwaukee, Wisconsin, for $1,500, and agreed, should the option be exercised, to employ Nim-phius at $100 per week for the duration of any contracts which might be obtained, plus 12%% of the net profits. On July 16, 1941, Articles of Incorporation were filed with the Secretary of State of the State of Wisconsin on behalf of plaintiff, with the authorized capital stock of plaintiff fixed at 500 shares of common stock of no par value. A short time thereafter, Brecke and Polland, as agents for plaintiff, agreed to employ Nimphius at $100 per week on government contracts, and Nimphius executed a bill of sale conveying his entire business to Brecke and Polland.
At a meeting on August 2,1941, Brecke became president, Polland became secretary-treasurer, and Mark McKee became vice president of plaintiff, and the value of plaintiff’s stock was fixed at $50 per share. The promoters agreed to exchange the Nimphius business for $5,000 in corporate stock, and in exchange therefor 25 shares each were issued *170 to Brecke, Polland, McKee, and Joseph Rothmeyer. Certificates for 100 shares each were issued to the four stockholders at that time.
In late July and early August of 1941, plaintiff, with no assets except the business acquired from Nimphius, advised the Department of the Navy that it had a total capitalization of $25,000, raw and/or finished materials with an average value of $14,000, annual sales of $35,000, and that it had taken over and reorganized the Nimphius Boat Company, added new capital, equipment, and personnel, and was in an excellent position to accept contracts on wooden vessels of various types 150 feet or less in length.
After a number of unsuccessful attempts to obtain government contracts, plaintiff, early in January 1942, submitted to the Navy Department a bid offering to construct two to ten twin-engine aircraft rescue boats within 90 days after the date of award of the contract. On January 29,1942, plaintiff reduced its bid price to $17,180 per boat and again promised delivery within 90 days. Plaintiff received a notice of award of Navy contract 99019 on February 7,1942, and on February 12 a formal contract bearing the same number was entered into for the construction and delivery of four 36' 6" aircraft rescue boats powered by Sterling engines, with spare parts, at a total contract price of $72,105.08, to be delivered within 90 days.
The contract specifications for the boats had originally called for matched pairs of Hall-Scott “Invader” engines, but as issued, provided that Sterling engines were to be furnished. The boats were to be constructed from Navy plans, and were to be 36' 6" in length, with beams 10' 7%".
The use of the larger and heavier Sterling engines necessitated a revision of the Navy’s lines and offsets plan. On February 15, 1942, plaintiff was advised by wire that the boat lines were being altered and to await further instructions. A revised plan was prepared and forwarded to plaintiff on March 3, 1942; this plan, however, was in turn replaced by a revised plan transmitted to plaintiff on March 25, 1942. These revisions, which become important in connection with defendant’s counterclaim, hereinafter discussed, *171 increased the width of the hull or beam from 10' 714" to 11' 3".
Plaintiff’s financial resources were, at the outset, totally inadequate for the performance of the contract. It had no working capital when it submitted a bid to construct two to ten boats, and was, as plaintiff’s president put it, “in dire need of finances.” Its “finances [were] nil.” The Sterling Engine Company, which was to supply engines for the boats, communicated with plaintiff repeatedly during the period from February 21 to April 13, 1942, requesting plaintiff’s order, priority rating, and advance payment of 30% which Sterling required so that work on the engines might proceed. On April 13, plaintiff issued a purchase order for eight Sterling engines at $43,569.08, but the required advance payment was not made.
During the latter part of May and June 1942, McKee and Rothmeyer, two of plaintiff’s four stockholders, made advances in a total amount of approximately $11,600. On June 27, 1942, these two stockholders reorganized the corporation, at which time negotiations for a new location at Racine, Wisconsin, were authorized. On July 24, 1942, the corporation was again reorganized. Otto H. Falk, Jr., who had no prior experience in operating a boatbuilding company, offered to purchase half of plaintiff’s authorized stock, and did acquire 22 shares. Falk subsequently acquired 98 additional shares, at a total investment of $6,000, and on August 14, 1942, he succeeded Pollard as vice president.
In August of 1942 plaintiff’s shop was moved from South Milwaukee to Racine. This resulted in the loss of several working days. At that time Falk dismissed most of Nim-phius’ organization,[2] and Nimphius, who was an experienced boat builder, left the corporation. E. M. Friedel, who had been employed as Nimphius’ assistant about June 15, 1942, succeeded Nimphius as superintendent.
*172 Friedel, although, bard working, had little or no experience in the boatbuilding industry. After he became superintendent, he reorganized the shop, ordered and reordered materials, and became familiar with the boat plans. This necessarily consumed some time. He also began to hire men whom he considered to be experienced boat builders. One builder was hired on August 31, 1942, but it was not until about December 1, 1942, that two others were obtained. During this period some workers hired were inefficient and had to be laid off, while others had only limited experience.
After plaintiff’s shop was moved to Eacine, the Supervisor of Shipbuilding at Chicago acquired jurisdiction of the contract. He immediately began to inquire as to plaintiff’s progress, and as the result of his survey of the situation recommended that plantiff’s contract be cancelled. Falk made various promises and representations as to plaintiff’s ability to perform, expressed his willingness to bear all losses on the contract,[3] and succeeded in bringing about a complete reorganization of plaintiff. Falk purchased all the issued stock of plaintiff and secured the resignations and releases of all its officers and stockholders, and plaintiff was thereupon permitted to continue work on the contract.
When Falk assumed control, in August of 1942, the first of the four boats was about 25% complete, exclusive of engines. The second and third boats were approximately 15% complete, and practically no work had been done on the fourth boat. At about this same time, plaintiff was allocated Sterling engines commencing in November 1942. Plaintiff’s progress had apparently been less rapid than that of other contractors engaged in building similar boats, as some of those contractors were allocated engines beginning in August 1942.
On October 8,1942, plaintiff was informed by a representative of the Iiall-Scott Company that eight right-hand engines[4] could be furnished immediately if allocated by the Navy, and plaintiff requested that this substitution be authorized. The contracting officer, on November 10, 1942, *173 authorized a modification of the contract to provide for the substitution of Government-furnished right-hand Hall-Scott “Invader” engines in place of contractor-furnished Sterling engines. Plaintiff was authorized to proceed on this basis with a contract price adjustment to be made later.
At this time the Supervisor of Shipbuilding transferred eight Hall-Scott engines to plaintiff. These engines were unsuitable and were returned to the Navy at its expense. Plaintiff was paid all costs resulting from this error. Substitute engines were received by plaintiff on November 25, 1942. There was at that time ample hull work available so that no overall delay resulted from the fact that engines were not received sooner.
Under the contract, plaintiff was to conduct at its own expense acceptance trials prior to the delivery of each boat. In January of 1943, it was agreed, at plaintiff’s request, that speed and maneuverability trials on the first boat could be conducted in San Francisco Bay, with Falk and plaintiff’s engineer to accompany the boat there at plaintiff’s expense. Falk took four of his employees to San Francisco with him, at considerable expense. During this period, work on the other boats proceeded, but was delayed to some extent by the absence of the four employees. The boats were delivered to defendant on March 10, April 14, April 7, and May 5, 1943, respectively.
On December 30,1942, the contracting officer had requested plaintiff’s advice as to the adjustment in contract price resulting from the change from contractor-furnished Sterling engines to Government-furnished Hall-Scott engines, stating that the reduction “should be based on the cost of Sterling engines.” Commencing about May 28, 1943, plaintiff and the Department of the Navy engaged in a protracted controversy over the settlement of the contract, principally with regard to the above adjustment in contract price. The findings report the course of the controversy, with the facts bearing chiefly upon the question of the adequacy of plaintiff’s request for relief. For the reason heretofore given, those facts will not be repeated.
On January 17, 1947, following the passage of the Lucas Act, plaintiff filed a claim with the Navy Department alleg *174 ing a total cost of performance of $96,366.63, payments on the contract of $26,957.04 ($13,320.61 has subsequently been paid), and a loss of $69,409.59 in the performance of the contract. Plaintiff’s claim was denied on December 9, 1947, by the Navy Department War Contract Eelief Board on the ground that no written request for relief within the meaning of section 3 of the Act had been filed with the Navy Department by plaintiff.
The record before us falls far short of establishing that the losses suffered by plaintiff in the performance of its only Government contract between September 16, 1940, and August 15,1945, or any portion of such losses, were incurred without its fault or negligence. Many factors, some of which are referred to below, were responsible for or materially contributed to plaintiff’s losses.
Throughout the contract period, plaintiff’s officers were inexperienced in the boat-building industry and contributed little to the performance of the contract. For a substantial part of the contract period, plaintiff’s finances were totally inadequate for the performance of the contract. Among other things, payrolls could not be met and materials had to be ordered on a piecemeal basis. Though varying in degrees from time to time, plaintiff never had an efficient organization to construct the boats. For much if not all of the contract period, plaintiff’s equipment was inadequate to perform the contract work; it did not have on hand machinery, equipment, and small tools which an experienced boat builder would have had as necessary to the business. There was, as Falk described it, “gross mismanagement” until August 1942. Some of the work performed was rejected as defective. The expense of testing a boat in California could have been greatly reduced, while at the same time speeding up the completion of the remaining boats. The move of plaintiff’s shop to Eacine resulted in the loss of time and extra costs, although plaintiff did derive certain advantages from the transfer. Plaintiff’s office manager and purchasing agent, who was ultimately discharged because of financial discrepancies, was retained on the payroll until January 31,1943, at a cost of over $1,500, *175 despite the fact that he was incompetent and spent little time on the job.
Plaintiff originally asserted that the reasonable and necessary costs of performance of the contract amounted to $93,944.65, and that the net losses incurred were $53,167. Recovery was sought only in the amount of $22,713.08, plaintiff conceding that it made no request for relief with respect to any other losses. In a computation set forth in its brief, the reasonable and necessary costs of performance claimed are reduced to $66,929.60, and the net losses incurred are reduced to $26,651.95.
Under the circumstances of the case, referred to briefly above and covered more fully in our findings, we are of the opinion that plaintiff may not recover on its Lucas Act claim. See Reltool Service Company v. United States, 128 C. Cls. 14, and cases there cited.
COUNTERCLAIM
Plans for the lines and offsets of the boats were twice revised. In the course of the lengthy controversy over the settlement of the contract, the head of the department, in response to a letter from Falk, plaintiff’s vice president, indicated that “the contract price should be increased only to the extent necessary to cover the change in lines, if substantiated.”
Subsequently, on May 17, 1945, plaintiff submitted to defendant a detailed breakdown of costs incurred because of the changes in lines of the boats. Plaintiff indicated that between February 8 and March 26, 1942, under plans ultimately superseded, it had expended some $2,912.37, including $1,245.20 for labor, $621.20 for materials, and $1,045797 for overhead. The contracting officer, in his settlement proposal of June 14,1945, allowed plaintiff the entire amount of the claimed increased costs resulting from the changes in plans without investigating the facts, and plaintiff has been paid this amount as a part of the total contract price.
Plaintiff did not expend the amount claimed by it and allowed by the contracting officer, and this fact was clearly apparent from plaintiff’s records at the time plaintiff’s claim *176 of May 17, 1945, was prepared. Plaintiff did not lay any lines under the plans ultimately superseded.
In its brief, plaintiff asserted that the decision of the contracting officer, not appealed from, on a question of fact under the “Disputes” article of the contract is final and binding upon both plaintiff and defendant, in the absence of fraud on the part of the contracting officer. United States v. Wunderlich, 342 U. S. 98. Defendant contended that in the instant case plaintiff’s claim, made at a time when it was clearly apparent from plaintiff’s books and records that the amount claimed by it had not been expended, was a misrepresentation constituting a breach of contract, for which defendant was entitled to recover damages measured by the amount of the erroneous overpayment.
We are of the opinion that under the 'Wunderlich doctrine or under the Act, approved May 11, 1954 (68 Stat. 81), plaintiff may not take advantage of the rule attaching finality to administrative decisions to profit from making a claim for money it did not spend and which its records clearly showed was unjustified.
Plaintiff’s petition is dismissed. Judgment will be entered in favor of defendant on its counterclaim in the amount of $2,912.37, plus interest at the rate of 4% per annum from the date of demand, September 4, 1952. See McClure, et al. v. United States, 125 C. Cls. 16.
It is so ordered.
Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
Laramore, Judge, took no part in the consideration or decision of this case.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, as follows:
1. This is an action brought under the Act of August 7, 1946, the War Contract Hardship Claims Act or Ducas Act, Public Law 657, 79th Congress, 2d Session, chapter 864, 60 Stat. 902,41U. S. C. (Supp. V) § 106 note.
*177 The suit was transferred to this court from the United States District Court for the District of Columbia pursuant to the provisions of section 6 of the Lucas Act as amended by section 87 of the Act of June 25, 1948, Public Law 773, 80th Congress, 2d Session, 62 Stat. 869, 992.
Defendant’s motion to dismiss the petition on the ground that the petition and accompanying exhibits failed to show that plaintiff complied with section 3 of the Lucas Act by filing prior to August 15, 1945, a proper written request for relief from the losses claimed was overruled by this court April 4,1949,113 C. Cls. 276.
2. On May 19, 1941, Hoy L. Brecke, and Milton Polland, an insurance salesman, both of Milwaukee, Wisconsin, obtained an option to buy the boatbuilding business, including materials and equipment, of Ferdinand Nimphius of South Milwaukee, Wisconsin, for $1,500, and agreed to employ Nimphius, should the option be exercised, at $100 per week for the duration of any contracts, plus 12%% of the net profits.
On July 16,1941, Articles of Incorporation were filed with the Secretary of State of Wisconsin on behalf of plaintiff with the authorized capital stock fixed at 500 shares of common stock with no par value. On July 24, 1941, a further agreement was entered into. Brecke and Polland, as agents for plaintiff, agreed to employ Nimphius at $100 per week on Government contracts, and Nimphius agreed to and did execute a bill of sale conveying his entire business, including inventory and equipment, to Brecke and Pollard, who made no payment therefor.
At a meeting on August 2, 1941, officers were elected and the value of the stock was fixed at $50 per share. The promoters agreed to exchange the Nimphius business for $5,000 in corporate stock, and in exchange therefor 25 shares each were issued to Brecke, the president, Polland, the secretary-treasurer, Mark McKee, the vice president, and Joseph Rothmeyer. Certificates for 100 shares each were also issued at that time to the four stockholders.
Wisconsin law provided that Wisconsin corporations were not to transact business with other than its members until *178 one-half of the authorized capital stock was subscribed and one-fifth (here $5,000) was actually paid in. This requirement was not met in plaintiff’s case until about June 1942.
3. In letters dated July 31 and August 7, 1941, plaintiff advised the Department of the Navy that it was a Wisconsin corporation with “total capitalization or amount invested” of $25,000, “raw and/or finished materials” with an average value of $14,000, annual sales of $35,000, and that it had taken over and reorganized the Nimphius Boat Co., added new capital, equipment, and personnel, and was in excellent position to accept contracts on various wood vessels 150 feet or less in length. At that time plaintiff had no assets except the business acquired from Nimphius.
Thereafter plaintiff made a number of efforts to obtain Government contracts to build boats but was not successful until it was awarded a contract as described in subsequent findings.
4. In late 1941 or early 1942, in response to an invitation by the Department of the Navy to bid on twin-engine aircraft rescue boats, plaintiff obtained plans and specifications therefor. The bid specifications stated that Sterling engines were to be furnished in lieu of the two Hall-Scott “Invader” type engines specified in the printed specifications. On January 3,1942, the Sterling Engine Company quoted plaintiff a price of $10,814.27 for a matched pair[5] of the Sterling Dolphin Engines with spare parts ($43,257.08 for four boats), with an advance payment of 30% or $13,070.72 when ordered, first delivery in 60 days and in accord with Navy allocation.
5. Early in J anuary 1942 plaintiff submitted a bid to the Department of the Navy and offered to construct two to ten aircraft rescue boats for $13,200 each within 90 days after the date of award of the contract. Plaintiff had made a miscalculation in its bid and on J anuary 1'6,1942, plaintiff wrote the Navy that its bid should be increased from $13,200 to $18,810 as plaintiff had bid on only one engine instead of the two specified. This required an increase of $5,100 plus 10% for installation or $5,610 for the second engine. This bid *179 was for $7,590 per boat, exclusive of engines. Plaintiff was unable to produce its detailed estimates of the cost of constructing the boats.
6. On January 29, 1942, plaintiff reduced its bid to $17,180 per boat for four boats and promised delivery within 90 days of the contract. All bids were within a few hundred dollars of each other. Plaintiff received a notice of award of Navy Contract NOs. 99019, dated February 7, 1942, and was notified that inspection would be by the Supervisor of Shipbuilding at Manitowoc, Wisconsin.
A formal contract (NOs. 99019) was entered into on February 12,1942, for four 36' 6" aircraft rescue boats, powered by Sterling engines, with spare parts, at a total contract price of $72,105.08. The contract required the. boats to have a maximum speed of not less than 35 statute miles per hour, subject to a deduction of $200 for each full quarter mile below the guaranteed maximum, and called for delivery in 90 days.
Both the invitation to bid and the contract specifications provided in part as follows:
1. INTENT: ■
These specifications are intended to cover the procurement of Aircraft Eescue Boats of about 36 feet 6 inches in length for use in rescuing personnel from crashed aircraft. They shall be of the high speed, V-bottom type and of strong and rugged construction. The contractor will be required to furnish these boats completely fitted out and ready for service (except for Government furnished outfit regardless of whether or not all necessary or usual items have been covered in detail by these specifications).
2. Speed requirements :
A maximum speed of not less than 35 statute miles per hour, in the following service load condition, is required. * * *
3. Hull plans :
The boats are to be built in accordance with the following plans, which form a part of these specifications, subject however to any changes which may appear in these specifications and/or any improvements which may be recommended and approved during the construction period:
*180 Bureau Plan Number Title
481114 Lines and Offsets
875887, Alt. B Type Arrangement
481115 Scantling Details
123852, Alt. n, B. D. S. No. Ill Fuel Tank Fittings
481121 Hoisting Slings (see paragraph. 34)
481116 Sheer Legs (see paragraph 33)
4. Submittal op PLANS:
These specifications are intended to be sufficiently general in character to permit development and improvements in the design, subsequent to letting the contract, and during construction. To insure that the proposed boats will be of suitable design and that the construction details will be adequate, the contractor shall, before any construction is undertaken, submit copies of his working plans, covering any and all modifications to the plans accompanying these specifications and/or those furnished with his bid, which he may propose, for the consideration and approval of the Bureau. * * * It will however be clearly understood that such changes shall not involve increased cost under the contract. It will be further understood that approval of the contractor’s plans will not relieve the contractor of his responsibility to furnish boats in all respects in accordance with the intent and purpose of these specifications and suitable for the use intended. For purposes of scheduling fabrication and delivery, the contractor may assume that about 15 days, from the date of receipt, will be required by the Government for action on each drawing or group of drawings, submitted or resubmitted.
6. MATERIAL AND WORKMANSHIP:
The workmanship shall meet in every respect the highest modern standards of first class motor boat construction, and the finish shall be high class. Only the best materials shall be used throughout. * * *
sje $ ‡ ‡ $
It is intended that the boats be built, complete in all respects, as specified and/or indicated on plans and items not fully described or specified, but essentially necessary for the proper completion and operation of the boat, shall be furnished by the contractor without additional cost to the Government. Care should be exercised to eliminate unnecessary hull weights.
*181 9. DIMENSIONS;
Length over all, 36 feet 6 inches.
Beam, outside of planking — 10 feet 7% inches.
Draft, about 3 feet 0 inches.
V H* «5* H»
11. PRINCIPAL CONSTRUCTION PARTICULARS:
$ ‡ $ *
J. Engine Foundations:
Engine foundations shall be developed by builder in general accordance with Bureau Plan No. 481115, adapted to twin engine installation. They shall be fabricated from galvanized steel webs, brackets and angles, bolted as required to the stringers, floors, bulkheads and bulkhead stiffeners. Before construction is started the contractor shall submit to the Bureau of Ships, for approval, complete detailed plans of the engine foundations designed to suit the engines which are to be installed.
* $ * * *
Deductions :
Should, during the high speed trials, any of the boats fail to make the guaranteed maximum speed required by the contract, two hundred dollars ($200.00) for each full quarter mile below the guaranteed maximum speed will be deducted from the prorated contract price of each boat which fails, provided that no deduction shall accrue for fractions of one quarter mile per hour. The Navy Department reserves the right to reject any of these boats or to accept such boat at a reduced price agreed upon, if it fails to attain an average speed on trials of 32 miles per hour. * * *
The contract was also accompanied by a $2,500 performance bond executed by the United States Fidelity and Guaranty Company.
7. The boats were designed for use in rescuing personnel from crashed aircraft. To one familiar with the boatbuild-ing industry, their construction would not be considered difficult or exacting. They were high speed work boats, without plumbing, heating, and cooking facilities, with no living accommodations, and carrying no ordnance. They were somewhat similar to boats used by oil companies to take people back and forth between the shore and a larger vessel where there is drilling for oil, and were considerably simpler to build than yachts or pleasure boats.
*182 8. Plaintiff had no naval architect and plaintiff and other contractors building the aircraft rescue boats employed Otten, Liskey and Rhodes of Washington, D. C., as a subcontractor and design agent to prepare the working plans.
The use of the larger and heavier 800-horsepower Sterling engines specified in the contract, in place of the 250-horsepower Hall-Scott Engines, required a revision in the lines and offsets plan, Drawing No. 481114. On February 15, 1942, the Navy’s Bureau of Ships wired plaintiff that the boat lines were being altered abaft station 5 and to await further instructions. A revised plan No. 502804 was prepared February 13,1942, and received by plaintiff February 17,1942. On February 25,1942, the Bureau of Ships transmitted various plans to the Supervisor of Shipbuilding at Manitowoc, Wisconsin, who in turn transmitted them to plaintiff March 3, 1942. Plan No. 502304 was in turn replaced by a revised lines and offsets plan, No. 509160.
After submitting the revised lines and offsets plan No. 509160, prepared March 12, 1942, to plaintiff’s design agent in Washington, the Bureau of Ships, on March 23,1942, also transmitted the plan to the Supervisor of Shipbuilding with the comment that in view of the status of construction, the modification might be regarded as a development, involving no increased cost. The Supervisor of Shipbuilding transmitted the plan to plaintiff March 25, asked whether the revision was acceptable as a development, and instructed plaintiff that, if additional cost was involved, not to proceed until authorization was obtained. Plaintiff proceeded without objection despite simultaneous instructions to make differences the subject of immediate correspondence.
Plaintiff received a preference rating on February 24, 1942, but did not commence ordering materials until April 1942 and it did not receive the spruce used in laying the lines for the first boat until April 24,1942.
9. The record fails to establish that plaintiff’s promoters and officers had any experience in the boatbuilding business. Mr. Brecke, the president, was the secretary of the Wisconsin Petroleum Association. Mr. Polland, the secretary-treasurer, was an insurance agent. Mr. McKee, plaintiff’s vice president, was also vice president of the Wisconsin-Mich *183 igan Steamship Co., and a director of Pan American Airways. Mr. Rothmeyer was an industrial consultant living in the Detroit, Michigan, area. None of the officials of plaintiff was called as witnesses by plaintiff except Mr. Brecke who was under subpoena by defendant. Mr. Polland was subpoenaed by defendant as an adverse party. Plaintiff did not call Ferdinand Nimphius, the superintendent who was in charge of actual construction of the boats until August 1942. Mr. Nimphius was an experienced boat builder with 17 years’ experience, of which 12 were on a fulltime basis, but he was forced to operate with new and inexperienced help as his keymen had left for other jobs.
10. At the outset plaintiff’s financial resources were wholly inadequate for the performance of the contract. During the period July 16,1941, to the date of the contract, the promoters had made no payment on their stock subscriptions. When plaintiff bid it had no working capital. Its total available capital from February 14 to April 4, 1942, was a $500 advance by Mr. McKee, which was used in part to pay back rent of $40 per month, and payrolls totaling $213.35 for the weeks ending February 15 through February 28,1942.
During the period February 21 to April 13,1942, the Sterling Engine Company repeatedly communicated with plaintiff requesting its order, priority rating, and advance payment so that Sterling might proceed. Finally, on April 13, 1942, plaintiff issued its Purchase Order No. 11 for the engines at $43,569.08 but without making the required 30% down payment. In fact such down payment was never made.
Only $336 additional was available up to May 2, 1942. With its small bank account overdrawn, plaintiff was unable to meet any of its payrolls during the five weeks ending March 27 through April 25, 1942, although the payrolls totaled only $898. At that time two of the promoters, Brecke and Polland, obtained a loan of $900 for five days to meet the back payrolls and this was repaid by sums advanced by Mr. McKee.
11. On May 5, 1942, Mr. Brecke, plaintiff’s president, wrote to Mr. McKee, the vice president, and principal financial backer, as follows:
*184 Dear Mark : Tried to contact you over the week-end but was not successful. Mark, we are in dire need of finances for our boat company. We have the contract, amounting to $72,105.08; we have the approval of the blue prints and have a great deal of the material ordered and on hand but we have a payroll to meet every week, besides payment of all this material. Our finances are nil. Milt, and I each deposited $450 of our own money just to meet current bills and the payroll. The whole crew threatened to walk out on us.
Here is our proposition, Mark. We must have $20,000 at once. We have placed the order for the engines but they insist on a deposit of one-third before they go ahead with the engines. One-third deposit amounts to $13,000. The other $7,000 we need to pay the payroll each week and materials.
We contacted the State Bank of Milwaukee and they will loan us this money, under the personal guarantee of you, Rothmeyer, Polland and myself. IT IS IMPERATIVE WE GET THIS $20,000 AT ONCE. I am enclosing guarantee form which I will thank you to sign immediately and then mail to Rothmeyer and have him return it to us IMMEDIATELY. We want to get this money by the end of the week.
Trust we will be able to go over this entire situation with you very soon. We have a complete set of books set up now and want you to check over with us this entire business.
May we hear from you by return mail ? Please mail this guaranty direct to Mr. Rothmeyer so that we will not lose any time.
On May 14,1942, Mr. Polland wired McKee that the bank had rejected a loan unless personally countersigned by all stockholders, and that it was imperative that this capital be obtained at once, as it would otherwise be necessary to close the plant.
On May 27,1942, Mr. Brecke wrote Mr. McKee in part as follows:
First of all, there is an item of $13,023.92. This is for the 30% down payment on the engines which we ordered from the Sterling Engine Co. on April 13. They have written us several letters regarding this 30% down payment. To date we have not replied in that we did not know exactly what to say. THIS IS IMPORTANT.
Otten, Liskey & Rhodes, Washington, D. C., are the architects. They agreed on a price of $400. They *185 have requested a partial payment, and we believe we should send them at least $100 on account at once.
Monarch Hardwood Lumber Co., Chicago, agreed to give us 8% for cash or 2% 10 days. They have written requesting their money and will still give us the 2% off, even though it is more than 10 days past due. This invoice is for the Mahogany, in the amount of $983.80.
We have ordered electric horns, lights, and lamps from the E. J. Willis Co., New York City, but they have written us saying they want to ship this material C. O. D. as we do not have our credit established. This will amount to approximately $150.
We purchase screws, bolts, washers, etc., from H. M. Harper Co., Chicago. They have written that in order to keep our credit good so they can ship on open account, we should send them a check for $79.80, which was due April 10.
The attorney’s fees have never been paid, amounting to $447.70. However, he has written that $47.70 of this amount is cash advanced by his office for long distance phone calls. We should pay the $47.70 at once.
On May 6 Milton Polland advanced $180. to pay some payroll and other bills and in turn he charged some railroad tickets to the Milwaukee Engineering and Shipbuilding Co. Therefore, we should pay this invoice from the Milwaukee Load at once. They agreed to charge this for a few days, but not indefinite.
The telephone bill was due May 5, in the amount of $32.62, Wisconsin Telephone Co.
Western Union bill is $3.04 due May 1.
Social Security tax of $7.56 was due April 30. No doubt there will be a penalty on this too. This must be paid at once.
We are overdrawn $7.78 at the Marshall & Ilsley Bank. This should be paid immediately.
I have only listed the bills that are pressing and that must be paid at once. We have many others for material, etc., but the above listed should be taken care of immediately.
Please let me hear from you by return mail as to what you intend to do about these bills.
Very truly yours,
RLB.M President.
P. S. In addition to the above, our Superintendent, F. M. Nimphius, should have at least $10 a week petty cash to pay express charges and- small items he must purchase from time to time. Also, we should have $15 for postage.
*186 P. S. #2 — All this information was given to Mr. Knoblauch, by our secretary, Mrs. M. Meyers on Wednesday morning, May 27.
During the last part of May and in June 1942, Mr. McKee and Mr. Rothmeyer made additional advances to a total of about $11,600 and the payrolls were met through Mr. Knoblauch, Mr. McKee’s secretary at the Wisconsin-Michigan Steamship Co. Plaintiff often ordered materials on a piecemeal basis.
On June 27, 1942, Mr. McKee and Mr. Rothmeyer, the principal stockholders, reorganized plaintiff. Mr. Brecke was replaced as president by Robert Wiley, a lawyer without experience in the boat building business; Mr. Polland, the insurance salesman, became vice president; Mr. A. B. Minton became secretary and Mr. Knoblauch, treasurer. At that time negotiations for a new location at Racine, Wisconsin, were authorized.
On July 24, 1942, plaintiff was again reorganized. Mr. Knoblauch then succeeded Mr. Minton as secretary. At that time Mr. Otto H. Falk, Jr., offered to purchase 250 shares, acquired 22 shares for $1,100 and was made a director and general manager with Mr. Minton, assistant manager. At that time Mr. Falk was 37 years of age and had no prior experience in operating a boatbuilding company. Mr. Falk subsequently acquired 98 additional scares, making his total investment $6,000. On August 14,1942, Mr. Falk succeeded Mr. Polland as vice president, and the company was authorized to borrow $55,000 from the R. F. C. to purchase the engines and equipment.
12. In August 1942, plaintiff’s shop was moved from South Milwaukee to a building in Racine. Facilities for launching at Racine were not as good as those at South Milwaukee, but from other standpoints the building at Racine was superior to the one at South Milwaukee. This resulted in the loss of several working days which affected the cost and later resulted in large expenses for launching. At that time Falk fired most of Nimphius’ organization, several employees including a number of young boys, and Nimphius left the company. Mr. E. M. Friedel, who had been hired by Mr. *187 Nimphius about June 15, and became his assistant about July 1, 1942, succeeded Nimphius as superintendent.
At the age of eighteen Mr. Friedel had been a helper in a boatbuilding company for about eight months during the first World War but otherwise had no boatbuilding experience. Mr. Friedel was a hard working superintendent and a good carpenter but there is a considerable difference between carpenters and their tools and boatbuilders who work with curved structures and use different tools and more tools.
After Mr. Friedel took over, he required a few weeks to reorganize the shop to his liking, order and reorder materials, and to become familiar with the plans. He also began to hire men he considered to be experienced boatbuilders. One boat-builder was hired August 31, but two others were not hired until about December 1, and a fourth, January 27, 1943. During this period some inefficient mechanics were hired and had to be laid off. Others hired had worked only part time and had limited experience.
13. After plaintiff’s transfer of its facilities to Eacine, and as of August 17, 1942, the Supervisor of Shipbuilding at Chicago acquired jurisdiction of the contract and immediately began to inquire as to construction progress on the rescue boats. As a result of his survey, the Supervisor of Shipbuilding at Chicago recommended that the contract be cancelled and the work removed to another shipbuilder. However, in consideration of various promises and representations made by Mr. Falk, and his willingness to bear losses on the contract, plaintiff was permitted to continue.
Mr. Falk anticipated that any losses which occurred on this contract would be recouped in future work he hoped to obtain from defendant.
On August 25, 1942, the following telephone conversation occurred between Mr. Falk and Commander Goen, the Assistant Supervisor of Shipbuilding at Chicago:
Mr. Falk : 1. What about all this mess ?
Comdr. Goen: 2. Mr. Minton is down here to see Comdr. Dowd and he called up this forenoon to say that you had stepped out of it.
Mr. Falk: 3. I did, because the other fellows didn’t want to and I felt that if I am going to put up with what I did the other day; brought all the securities to back *188 up everything, lock, stock and barrel, and they didn’t want to get out because of the change — I am not accustomed to dealing with people in the sense of the word that they are just a bunch pf crooks, and I think you all know it, and I am willing to go on still.
Comdr. Goen : 4. Of course, we can’t see how those boats are going to be built if you don’t have a regular boat builder and an organization there.
Mr. Falk : 5. That, is what I am trying to put in. How can you do it if you don’t have the right or way ?
Comdr. Goen : 6. Well, I don’t know, but as a result of Mr. Van Deusen’s totally unsatisfactory quest for knowledge the first two days last week and lack of a boat builder and the general set-up, Comdr. Dowd recommended that the contract be cancelled.
•i» ‡ ‡ ‡
Mr. Falk : 15. The point I am trying to make is that I tried to get them out of the picture Saturday and I tried to throw them all out, lock, stock and barrel, and if I am willing to sit tight and go to the bank and draw all these securities out of there, the Bank is sold on the deal, lock, stock and barrel, willing to take the loss, willing to take everything, I must have some consideration or else I am going to have to get out. I can clean the whole thing up in not more than a week and clean it up right. Would you like to sit every day with your own money ($1,600 and $1,700 every week) and every time a truck came around, have to pay them C. O. D. ?
Comdr. Goen : 16. No, I wouldn’t be interested at all and I don’t see why you are.
Mr. Falk : 17. But I would like to do it. I got into it — now let’s get out of it. I am speaking for the U. S. A., and not for myself.
Comdr. Goen : 18. Our feeling here is that the situation is just about impossible as far as the Milwaukee Engineering and Shipbuilding Co., is concerned on getting those boats out in any reasonable time. We haven’t seen any boat builder there; Mr. Van Deusen is unable to find out what has been ordered and what hasn’t been.
Mr. Falk : 19. We haven’t either. The true facts are that things won’t begin because there is no money there and I am willing to place the money into the thing, and bad as may be the case, I can’t see why there should be any question about it.
*****
Comdr. Goen : 22. We don’t see any organization up there.
*189 Mr. Falk: 23. Why would you? Would you show interest to put more in when you had a bunch of crooks back of you ?
Comdr. Goen : 24. I wouldn’t go into it at all.
❖ * # # %
Comdr. Goen : 36. But I still don’t see a boat builder and I don’t see any organization.
Mr. Falk: 37. If that is the way you feel, you can’t expect a man to break his neck. I took all those “gyps” out of there, and if you would give me half a chance, I would have a boat out of there once a week. If you don’t want to take my word for it, it is O. K. with me.
Comdr. Goen: 38. All right. * * *
14. At this time Mr. Falk purchased Mr. McKee’s holdings at an undisclosed sum and Mr. Rothmeyer gave his stock to the Navy Relief Society, a private charitable corporation incorporated in the District of Columbia. On August 27, 1942, Mr. Falk wrote the Supervisor of Shipbuilding at Chicago in part as follows:
This is to advise you that today I succeeded in bringing about a complete reorganization of the Milwaukee Engineering & Shipbuilding Co.
I have purchased all of the issued stock of the company and secured the resignations and releases from all the officers and stockholders, who as you know, were entirely responsible for the gross mismanagement that has existed to date.
Thereupon plaintiff was permitted to continue the work as stated in finding 13. The company proceeded without officers or directors, except Mr. Falk, until March 17,1943, when Mr. Falk was designated president, Mr. Friedel, vice president, and Mary Thome, secretary-treasurer. Mr. Falk merely financed the company, spent little time on the job, and had no prior experience in shipbuilding. He endeavored to run the concern in a proper businesslike manner.
15. The record does not establish the exact status or stage of completion of the boats at various pertinent dates. About June 15,1942, three hulls were standing with the frames set, some whalers on, and the ribs incomplete, and the frames, bulkheads, transom, keel, and stem were made on the fourth. It was estimated that when Mr. Falk assumed control, in August of 1942, the first of the four boats, exclusive of *190 engines, was about 25% complete, the second and third about 15% complete, and the fourth relatively unchanged from June 15, 1942. Plaintiff did not request progress payments as provided by Contract Article 8 as the work proceeded although aware of the contract provisions.
Plaintiff’s progress was less rapid than that of the other four shipbuilders who had similar contracts. Consequently on August 26,1942, plaintiff was allocated Sterling Engines commencing in November 1942, whereas some contractors were allocated engines commencing in August 1942.
About October 8,1942, a representative of the Hall-Scott Company advised plaintiff that eight right-hand[6] Hall-Scott Invader engines could be furnished immediately if allocated by the Navy Bureau of Ships and plaintiff requested that this substitution be authorized.
On November 10,1942, the contracting officer wrote plaintiff as follows:
Confirming advance authorization given you by the Bureau of Ships, the subject contract is modified to provide for the substitution of Government furnished Hall-Scott Invader engines in place of contractor furnished Sterling engines as specified in the contract.
It is requested that you advise as to what reduction in the contract price will result by reason of this modification. However, you are authorized to proceed on the above basis, price adjustment to be made at a later date.
At the same time the Supervisor of Shipbuilding transferred eight Hall-Scott Engines to plaintiff for “storage and later installation” in the vessels. These engines were salt water cooled, were unsuitable, and were returned to the Navy at its expense and plaintiff was paid all resulting costs. It is not established by the record that any actual delay in the building of the rescue boats resulted from this erroneous shipment. Substitute engines were received November 25, 1942.
16. At this period the hull on the first boat was not quite complete, but work on it was delayed somewhat due to a lack of engines. The hulls on the remaining three were only about 85,85, and 20 percent finished, so that ample hull work was available, and no overall delay resulted.
*191 Sterling engines were available on December 7,1942, when Sterling wired plaintiff that the balance of the engines ordered was being shipped by sight draft bill of lading as the down payment had not been made, but plaintiff cancelled its prior order for Sterling engines by wire, pointing out that Hall-Scott engines had been allocated and received.
On December 30, 1942, the contracting officer requested plaintiff’s advice as to the amount by which the contract price should be reduced because of the substitution of Government-furnished Hall-Scott engines for the Sterling engines, which were priced at $40,800 or $43,569.08, including spare parts, stubshafts and pulleys, and stated that the reduction “should be based on the cost of Sterling engines.”
17. The contract (page 16) required that the contractor conduct “at his own expense” acceptance trials prior to delivery of each boat. Preliminary acceptance trials for all items requiring inspection only were scheduled at Milwaukee January 25, 1943. At the request of the contractor, it was verbally arranged on January 6,1943, and agreed to in writing on January 22, 1943, that speed and maneuverability trials on the first boat could be conducted in San Francisco Bay, the contractor and his engineer to accompany the boat there at the contractor’s expense. While these trials were being conducted in San Francisco, work on the other boats proceeded but was delayed by the transfer of several employees to California for trials on the first boat. The boats were delivered March 10, April 14, April 7, and May 7,1943.
18. On May 10, 1943, the Supervisor of Shipbuilding reported to the Chief of the Bureau of Ships that the four boats had reached speeds of 30.25, 30.00, 30.00, and 32.40 statute miles per hour, instead of the required speed of 35 statute miles per hour. However, in view of the change in the extreme beams of the hulls from 10' 7to 11' 3" and the substitution of Hall-Scott engines with right hand pro-pellors, and considering the excellence of the boats in all other respects, he recommended waiver of the speed penalty, which at $200 for each full quarter mile below the guaranteed maximum amounted to $13,800. The contracting officer notified plaintiff on May 28, 1943, that the speed penalty would not be imposed.
*192 19. Commencing about May 28,1943, plaintiff and the Department of the Navy engaged in a protracted controversy over the settlement of the contract, principally with respect to the deduction to be made because of the substitution of Government-furnished Hall-Scott engines. After a conference in Racine with representatives of the Supervisor of Shipbuilding on May 28,1943, plaintiff wrote the contracting officer that it desired to discuss the contract terms and would be glad to go to Washington for this purpose.
On June 7, 1943, the Acting Supervisor of Shipbuilding wrote plaintiff and offered to make a preliminary settlement allowing $6,175 for “changes” but deducting $43,257 for the Sterling engines not furnished. On July 24, 1943, plaintiff wrote the Chief of the Bureau of Supplies and Accounts and submitted vouchers totaling $64,933.08. Plaintiff claimed the full contract price, $72,105.08, plus $13,575 for an itemized list of “Estimates of Changes Under Contract” and proposed a deduction of $20,700 (instead of $43,257) for the Government-furnished engines. At that time plaintiff claimed the increase in the width of the hull had cost $3,200.
On August 2, 1943, the Supervisor of Shipbuilding wrote plaintiff and inquired as to the items of the “estimates of changes under contract,” which had not been presented on May 28, and requested the “authorizations for such changes” and a “breakdown of estimated costs.” The supervisor particularly requested the basis for the deduction of $20,700 instead of $43,257 for Sterling engines. The plaintiff replied on August 10, 1943, that the “present Officials of the Company were not aware of the same [claims] until after a thorough check of our files and data and investigation thereof,” that various claims for changes not authorized in writing were being presented for equitable adjustment under the “provisions of Article 2 of contract,” and “that the amount of $43,257 shown as bid of Sterling Engine Company was not the correct price.” Plaintiff further stated that it had merely estimated the cost of the change in the width of the hull at $3,200 but that the actual cost was greater. On August 16,1943, the Acting Supervisor of Shipbuilding advised plaintiff that the supervisor was unable *193 to approve the claimed changes and suggested a conference in Chicago on September 4, 1943. At the request of the supervisor this conference was postponed. At a conference on September 7, 1943, at Hacine with representatives of the Supervisor of Shipbuilding, at which claims for changes and extras were discussed, plaintiff contended that the contract provided for Hall-Scott engines. Thereafter plaintiff, on September 20, 1943, wrote the Chief of the Bureau of Supplies and Accounts and requested a partial payment. Prior thereto the contractor had not requested progress payments, or expressed a willingness to accept a preliminary payment.
On September 27, 1943, the Supervisor of Shipbuilding wrote plaintiff and proposed a preliminary settlement of $27,229.33 with an allowance of $7,359.80 under Article 2 of the contract for “Changes” and a deduction of $43,257 because Sterling engines were not furnished. The change order was approved November 4,1943, and preliminary payment of $26,957.04 was made November 11,1943.
On December 3, 1943, the Supervisor of Shipbuilding wrote plaintiff that, in the opinion of that office, the amount due in final settlement after payment of the $26,957.04 was $9,047.76, after deducting $43,413.08 because Sterling engines were not furnished. The supervisor advised plaintiff that in the event it still refused to agree to this deduction, the supervisor desired to call the contractor’s attention to Contract Article 12 on “Disputes.”
About two and one-half months later, on February 18, 1944, plaintiff renewed its demand of July 24, 1943, for $64,933.08, deducting the $26,957.04 previously paid. The Supervisor of Shipbuilding adhered to his prior recommendation and on May 8, 1944, the contracting officer tendered payment of the $9,047.76 to plaintiff upon execution of a release.
20. Under date of June 10,1944, plaintiff wrote the Secretary of the Navy and requested his personal advice and comment, stating in part as follows:
* * * The company is requesting a sum of $64,933.08 the Navy wants to pay $36,004.80, our costs to build these boats was in excess of $90,000.00.
*194 This contract was obtained by a political co-up, with no equipment or knowledge of the boat building business, which caused considerable delay in construction progress. * * *
On July 5,1944, the Secretary replied that he had had an investigation made and stated in part as follows:
Prior to the making of the subject contract, the proposed specifications called for the installation in the boats of Hall Scott engines to be furnished by the contractor. During the course of the negotiations, it was decided that the boats should have Sterling engines. The quotation submitted specifically called for the installation of Sterling engines, and the contract was so drawn. The contract was later modified to provide that the engines would be Government furnished. In connection with that modification, your company was requested to submit a decrease in the contract price, which the Bureau of Ships considered should be equal to the cost of the Sterling engines. The amount your company submitted was $20,700.00, the cost to the Government of the Hall Scott engines eventually furnished for installation in these boats. The cost of Sterling engines for the boats would have been $43,413.08. The difference between these two sums constitutes the major portion of your claim.
The balance of the requested increase in contract price amounts to $6,215.20. Of this item $3,200.00 is said to be for increased cost due to changes in lines of the vessels. Although Mr. Friedel was requested to submit a cost breakdown justifying this increase, such a breakdown has never been received by the Bureau of Ships. The remainder covers miscellaneous changes necessitated by the adoption of Sterling engines in lieu of Hall Scott during the course of the negotiations. Since the contract as negotiated and signed provided that Sterling engines were to be furnished, the Bureau of Ships considered that no increase could be allowed for these changes.
In view of the above facts, I consider that the contract price should be increased only to the extent necessary to cover the changes in lines, if substantiated.
The Secretary’s reconsideration was requested, but plaintiff was advised the matter had previously been fully considered.
*195 About 10 months later under date of May 17, 1945, after other efforts by the Supervisor of Shipbuilding to complete settlement, plaintiff increased its demands from $64,933.08 to $77,470.37, and demanded payment of $50,513.33 instead of $37,976.04 as had been asserted on July 24,1943, February 18, 1944, and June 10, 1944. Plaintiff’s claim was summarized as follows:
Contract Price for 4 boats, Aircraft Kes-cue, and spare parts--- $72,105.08
Adjustments to contract price:
A. Increased cost changes mutually agreed upon between contractor and the Navy_ 7,359.80
B. Increased cost resulting from various changes as directed by the supervisor and/or the Navy during construction of these four boats_ 18,752.49
C. Decreased cost changes mutually agreed upon between contractor and the Navy_ (47.00)
D. Decrease change (outstanding est’d)_ (20,700.00)
Adjusted contract price- 77,470.37
Amount paid against contract price- 26,957.04
Unpaid balance_ 50,513.33
This claim was accompanied by (a) a breakdown of five items of “Increased Cost Changes Mutually Agreed Upon” in the sum of $7,359.80; (b) twenty-eight items of “Increased Cost resulting from Various Changes as directed, by the Supervisor and/or Navy during Construction” in the sum of $18,752.49; (c) “Decreased cost changes mutually agreed upon” in the sum of $47 minus; and (d) claim that the “Change in Main Engine from contractor furnished to Government furnished” should be $20,700.
Under date of June 14, 1945, the contracting officer authorized a settlement of $40,277.65, allowing $4,273.22 of the $18,752.49 in changes asserted under item (b) above, in addition to the $7,359.80 in changes previously approved. This $4,273.22 included $2,912.37 alleged to have been spent be *196 cause of changes in lines, which item is the subject of defendant’s counterclaim (findings 34-37). The contracting oflicer continued to deduct $43,413.08 because of the omission of contractor-furnished Sterling engines. The settlement recited that “This action is made pursuant to the authority of the First War Powers Act, and will facilitate the prosecution of the war.” This was a stock phrase customarily or commonly used at the time to express the authority of the Department of the Navy and Navy procurement was reported or considered to be accomplished pursuant to the powers granted under the First War Powers Act.
On June 28, 1945, plaintiff wrote the contracting officer, rejecting the proposed settlement, and proposed that the balance of the $18,752.49 would be waived if the $20,700 deduction were approved. Plaintiff stated in part:
3. With respect to item B, in reference (a) we had requested allowance of increased cost resulting from various changes, amounting to $18,752.49, of which the Bureau of Ships has recommended allowance of $4,272.85. While we believe our claims are fair and just in respect of the items modified or disallowed, in order to expedite the closing of this matter and the payment of the contract balance, we would be willing to waive any further claims hereunder provided the deduction of $20,700.00 requested in the foregoing paragraph be approved. 1
It was only due to the difficulty in obtaining Sterling engines, and to obviate serious delays, we were willing to take this high risk and the possibility of a high resulting loss had we erred in our judgment in proving the engines, as installed, would meet the requirements. It should be noted that the company had incurred considerable expense in parrying out its obligation in proving the success of this installation for which we have asked no reimbursement from the Navy.
4. For your information and guidance, the company has expended in the construction of these vessels, exclusive of the engines, amounts aggregating in excess of $90,000.00. On the basis of settlement proposed of $40,277.65 plus the requested reinstatement of the amount $22,713.08 (difference between $43,413.08 and $20,700.00 under Item D, reference (a)) we would have a resulting loss of approximately $30,000.00.
*197 Plaintiff contends that this letter constitutes its request for relief.
On August 80, 1945, the contracting officer, in response to plaintiff’s request of June 28,1945, for contract modification, replied that the deduction of $43,418.08 was an equitable adjustment and that his decision was made under Article 12 of the contract.
By letter dated December 28, 1945, plaintiff wrote the Bureau of Supplies and Accounts that plaintiff’s invoice of May 1945 was considered fair and just, that “due to the gross mismanagement that existed and the financial condition” of the company, cancellation had been recommended but that Mr. Falk had taken over and performed, and asked that if payment were not made as requested that settlement be by “mutual agreement.” On January 29,1946, the contractor’s attention was again called to the proposed settlement of June 7, 1945, which was based upon a deduction of $43,413.08, “conditioned on final determination by the Bureau of Supplies and Accounts that Sterling engines were an original contract requirement.”
On February 8, 1946, plaintiff again wrote the Bureau of Supplies and Accounts, repeated its contentions, and suggested a final settlement of $58,874.01 leaving a “Loss to contractor” of $35,070.64. On February 18, 1946, the contracting officer replied that there had been no appeal under contract Article 12 from his decision of August 30, 1945, which was now the final action on the change order of November 4,1943, and that the contractor had indicated acceptance of the adjustments of June 14, 1945, which made the revised contract price $40,277.65. After further correspondence and a conference between representatives of the parties the contracting officer’s decision was repeated August 12, 1946.
The Comptroller General issued a certificate of settlement, No. 1735010, to plaintiff dated April 4,1949, for $13,320.61, the balance of the proposed settlement of June 14, 1945, $40,277.65, and this sum was paid July 12, 1949, by the Treasurer of the United States. '
21. Under the Lucas Act, supra, the President was authorized to prescribe regulations for the settlement of claims, *198 Executive Order No. 9786, promulgated by the President pursuant to this authority on October 5, 1946, provided in part:
PART II — PILING OF CLAIM
* $ Sj4 * #
202. Each claim shall be in writing and shall contain or shall be accompanied by:
:£$ $ $ $ $
e. A copy of each written request filed on or before August 14, 1946, with the war agency concerned, for relief with respect to the losses claimed.
/. A copy of any other written request filed prior or subsequent to August 14, 1945, with any agency for relief with respect to the losses claimed.
g. A statement of any other relief sought from the Government with respect to the losses claimed.
* * H« * ❖
j. A statement in detail, as to each loss claimed, of the facts and circumstances which caused the loss and the period or periods of time during which the loss occurred.
1c. A statement, supported by reasonable detail, showing that the loss or losses claimed occurred through no fault or negligence on the claimant’s part.
* * * . ; * *
m. A statement showing the amount by which any loss, in respect of which a claim is made, reduced income or excess profits taxes of the claimant for any taxable year or years.
:!: # * :!= *
204. No claim for loss under any contract or subcontract of a war agency shall be received or considered unless a written request for relief with respect thereto was filed with such war agency on or before August 14, 1945; and no claim shall be considered if final action . with respect thereto was taken on or before that date.
22. On January 17, 1947, plaintiff filed its claim with the Department of the Navy for relief under the Lucas Act, asserting the following:
Total cost of performance_$96, 366. 63
Payment received Nov. 12, 1943- 26,957.04
Loss claimed- [7] 69,409.59
*199 In compliance with paragraph 202e, above, of the regulations, plaintiff listed as requests for relief prior to August 14,1945, the following:
(a) Invoices of July 24, 1943.
(b) Letter of September 20, 1943.
(c) Statement of Account, May 17, 1945. ■
(d) Letter of June'28, 1945.
Plaintiff also listed:
(e) Settlement proposal dated December 28, 1945.
(f) Settlement proposal dated February 8, 1946.
In compliance with paragraph 202;?, of the regulations, plaintiff asserted that the alleged loss was “incurred during the period December 1, 1941, to May 8, 1943.” Plaintiff alleged that there were:
_ 1. Material and significant changes in the specifications so that the finished drawings differed widely from the plan used in bidding; that in some respects the approved drawings were but a development of the original type plan, but more accurately the drawings specified an entirely different boat, insofar as shafting, shaft-logs, stuffing boxes, gasoline tanks, horns, lights, engine-foundations, lifting slings, a mahogany superstructure, bronze castings and screws, brass fittings and reinforcements and other revisions were concerned, also that bilge pumps, balsa-wood floats, boat covers, and spray rails were added:
2. There were changes which involved exhaust pipe lagging, intake scoop strainers, the fire extinguisher system, inclining experiments, radio installation, hull rewiring, running and range lights, gasoline lines, rod levers, stern tubes, rudders, quadrants, tiller arms and couplings, electric switches, the substitution of engines and the revision of propellor shafts and bearings;
3. There were delays in the receipt of engines, causing nonproductive labor by keymen and the utilization of skilled mechanics in less exacting work causing abnormal labor costs; also that plaintiff was requested to make up delays necessitating unexpected overtime payments as there was an acute shortage of skilled labor;
4. The 9th Naval District requested employment of protective personnel for security purposes; and
5. There were delays in the receipt of approved designs and an extended period of construction so that material and labor costs rose to a point far in excess of original estimates.
*200 The claim was accompanied by inter alia, the detailed statement of account dated May 17, 1945, in which the detailed claim for these same items totaled $18,152.49.
In compliance with paragraph 202/e of the above regulations and for the purpose of showing that the loss or losses claimed occurred through no fault or negligence on the claimant’s part, plaintiff asserted that “The claimant possessed a business location strategically located, executive personnel of advanced technical and business skill as well as some of the most highly skilled and efficient workmen,” that Mr. Falk had advanced $75,000 so the company was in a strong position to operate profitably, that it was “not reasonable to assume” that Mr. Falk would permit “avoidable inefficiencies or waste,” and consequently that failure to make a profit must have been due to changes in the original specifications and “delays in receipt of critical materials.”
On December 9,1947, the Navy Department War Contract Eelief Board denied plaintiff’s claim stating in part as follows:
Claimant’s letter of 28 June 1945 was not a request for an amendment of its contract without consideration to increase the contract price. It was rather a rejection of the Government’s offer of settlement arising out of a dispute concerning the proper interpretation of the contract which dispute commenced in November 1942. We are therefore constrained to hold, since the letter related only to the long continuing dispute over the interpretation of contract NOs-99019, that it was not intended by the claimant or regarded by the Contracting Officer as a request for relief separate and apart from claimant’s rights under the contract. It was not a request for an amendment without consideration which the Contracting Officer had authority to make under the First War Powers Act at the time the letter was received by him. Accordingly, the claim is denied on the ground that no written request for relief within the meaning of Section 3 of the Act was filed with the Navy Department by claimant.
23. The evidence fails to establish that plaintiff’s losses were incurred due to the factors specifically set forth in its Lucas Act claim, section (j) (1) (2) (3) (4) and (5) (finding 22), or that such losses were incurred without fault or negligence in the performance of the contract.
*201 There were no changes in the plans and specifications which were not fully compensated for by change orders.
In section 1 of its Lucas Act claim, plaintiff listed several items which are discussed below.
Due to the contract requirements that larger and heavier Sterling engines be furnished, it was decided to increase the beam of the hull 8", from 10' 7" to 11' 3". This required revision of one of the plans, the lines and offsets plan. The evidence does not establish that this resulted in any actual delay in the work.
The revision resulted in a small increase in labor costs and $150 to $200 in material costs, but not over $450 per boat for all costs. However, the payment of $40,277.65 included $4,333 for adaption of Hall-Scott engines and $2,912.37 for changes in lines and offsets.
Plaintiff’s losses are not attributable to the addition of bilge pumps, balsa-wood floats, canvas shipping covers and spray rails. Payment for these items was included in the change order of November 4,1943 (finding 19), for $7,359.80, at the exact price claimed by plaintiff. The bilge pump added was a mechanical pump, simple to pipe, and, like the balsa-wood floats, an ordinary yacht chandler’s stock or catalog item.
The proof does not establish that any losses were attributable to a change in the propeller shafts or shaft-logs. A 1%-inch monel shaft had been used in previous boats of this type and the Sterling Engine Company was to furnish a shaft coupling therefor. The same shaft could be used with Hall-Scott engines. Plaintiff’s design agents however arranged for a 1%-inch shaft made of naval brass, a weaker metal, which was larger but cheaper to use. Paragraph 4 of the contract specifications provided that “development and improvements in the design” were not to involve “increased costs under the contract.” The proof also fails to establish that plaintiff’s bid was based on the use of 1%-inch shafts, that such shafts were obtainable for $329.64 as claimed, or that 1%-inch shafts actually cost $575.11 as claimed.
The evidence does not establish that special stuffing boxes were required in lieu of stock items as claimed. Mr. Nim-phius expected to make his own patterns for these boxes as *202 they were neither stock items nor available, and bid accordingly. There is also no proof of any extra cost or loss attributable to the use of stuffing boxes.
The evidence does not establish any increased cost for gasoline tanks. The contract (pages 15-16) required the installation of running and range lights, horns, and electric switches “of approved commercial design of sufficient size.” Accordingly, the small claims totaling about $100 for the use of necessary brackets and a larger switch than plaintiff expected were not extra costs resulting in losses. Claims therefor were denied by the contracting officer without appeal.
No loss is attributable to the change in “engine foundations” as payment therefor was included in the $4,333 paid under the change order of November 4,1943.
There is no proof of any change or claim or loss because of the use of a mahogany superstructure, which was always required by the contract specifications.
The evidence does not establish any loss attributable to the use of bronze castings and screws or brass fittings and reinforcements. Plaintiff contended its costs would have been less if galvanized screws were used. The contract specifications provided that “Only the best materials shall be used throughout.”
If plaintiff considered any of the above items to be changes or extra, appropriate action was in order pursuant to the terms of the contract, Articles 2 and 3 on Changes and Extras. Plaintiff did not bring them to the attention of the Supervisor of Shipbuilding as instructed March 25, 1942, or appeal under Article 12, the “Disputes” clause.
24. The item specifically detailed in section 2 of plaintiff’s Lucas Act claim (finding 22) were all included in plaintiff’s claim of May 17, 1945, and either rejected or allowed by the contracting officer June 14, 1945. The total of the items, exclusive of any claims for overtime or non-productive labor, was about $3,000, of which about $950 was allowed and paid by the Navy. These allowances were made by the contracting officer although plaintiff failed to comply with the contract provisions on Extras and Changes.
*203 A claim for $111.71 because of a requirement that exhaust pipes be lagged was rejected because this was required by the contract specifications under Engine Specifications, subsection n which provided that the exhaust pipe “be suitably lagged to eliminate fire hazard and danger of burning personnel.” Claims for $79.36 for intake scoop strainers and $44.50 for revision of the fire extinguisher system were rejected as being required by the contract and for proper operation. Claim for an inclining experiment was paid on an adjusted basis and the full claimed cost of installing, an equalizing valve in the-gasoline lines at $59.60 was paid. A claim of $90 for radio installation was allowed for $60 and claims for hull wiring totaling $683.35 were allowed in the sum of $500.
The sum of $4,333 had been allowed for installing Government-furnished Hall-Scott engines in lieu of contractor-furnished Sterling engines. This allowed sum appears to have possibly been the entire cost of installing the engines rather than the extra cost occasioned by the1 substitution. Plaintiff estimated Sterling engine installation costs at $510 per engine or $1,020 per boat. The installation of Sterling or Hall-Scott engines required installation of similar items. No reasonably competent contractor would have had to spend more than $250 per boat extra because of the use of Hall-Scott engines, the principal costs involved being about $75 to narrow the engine beds with scabs, and $150 to $175 to change the exhaust piping because of the use of two right-hand engines.
An alleged increased cost and loss of $1,345 for the use of “special” castings, in lieu of “stock” items, for stern tubes, rudders, quadrants, tiller arms, and couplings was also rejected by the contracting officer. These items were required by the contract. Moreover the contractor’s superintendent expected to use special castings, making his own patterns, and taking them to a machine shop. The items were not stock items and the superintendent had been unable to procure them as stock items.
There is no specific proof of any of the items of costs claimed in section 2 of plaintiff’s Lucas Act claim, and the records allocating labor costs could not be produced.
*204 Tlie decision of the contracting officer disallowing these claims was never appealed under Article 12, the “Disputes” clause of the contract.
25. The evidence fails to support the contentions made in section 3 of the Lucas Act claim (finding 22). These contentions were also the same as those made in plaintiff’s claim of May 27, 1945, namely that during the period August 21 to November 25, 1942, “key men” and “skilled labor” employed to install the engines and to do other work requiring technical skill had to be utilized in less skilled work thus causing abnormal labor costs. The costs were stated to be $1,646.45, plus overhead for three months at $3,900, a total of $5,546.45.
Plaintiff delayed placing its order for the Sterling Engines until April 13, 1942, and then failed to make the 30% down payment of over $13,000, its capital being entirely inadequate, and consequently the plaintiff was the last boatbuilder on the allocation list. The down payment was never made by Mr. Falk after he assumed control. The evidence does not establish that plaintiff’s employees had to do inferior work at regular pay because of a lack of engines. The only key men identified were Mr. Friedel, the superintendent, Mr. Kotchi, Mr. Schoeppe and Mr. Graves. Mr. Friedel had virtually no experience in boatbuilding or installing engines. There is no evidence that his labor was not productive, and he appears to have been employed on a weekly basis without overtime. Mr. Graves, a carpenter and cabinetmaker, was employed almost from the start of the job and worked on the hulls during the period August 21 to November 25,1942. Mr. Schoeppe had been hired as an all-round boat builder ten days after the start of the purported slowdown on August 21, and worked on the hulls. Mr. Kotchi, the installation foreman, was hired July 27. Plaintiff’s productive labor force consisted of only 10 to 12 men during this period. As the hulls, including fittings, were largely unfinished on August 21,1942, a sufficient amount of work requiring skilled labor existed to make the use of overtime normal. This situation continued until substitute Hall-Scott engines were received on November 25, 1942. Plaintiff’s claim amounts to roughly 50% of the total salaries of these three employees *205 during the entire purported slowdown period. The proof does not establish that this plaintiff could have completed the boats three months earlier, or at any earlier time if engines had been sooner received or that its overhead could have been curtailed by $3,900 or any other amount.
Plaintiff had also contended that it expended $3,572.66 for overtime pay because of “the critical condition of procurement and delivery of materials,” changes in the lines and engines, and the “shortage of skilled labor,” and that it increased working hours at the request of the Navy. No specific proof of the amount of overtime expenditures was offered. There is no proof that costs were increased by critical conditions of procurement and delivery of materials. As shown in other findings, any such conditions and consequent losses were largely the result of plaintiff’s almost complete lack of working capital, inexperience, and constant disorganization. The proof does not establish that the changes in the lines and engines, for which plaintiff was compensated by change orders, resulted in any losses or was the cause of unusual overtime payments. There is no proof of any written or other request by defendant’s representatives that overtime work be performed, and no premium overtime was authorized for the defendant’s account.
26. The evidence establishes that any labor shortages which existed should have been foreseeable and were occasioned by lack of foresight or sound business management on the part of the contractor. At the time plaintiff entered into the contract war had been declared; there was a shortage of boat-builders in the area and Mr. Nimphius had no experienced boatbuilders in his organization. The move to Eacine and Mr. Nimphius’ departure also made it necessary for plaintiff to reorganize and procure some new employees. Plaintiff’s organization never exceeded about 16 regular shop employees and consisted of only 10 to 12 such employees following Nimphius’ departure.
27. The evidence does not establish that plaintiff’s costs were increased by $1,595.44 as asserted in section 4 of plaintiff’s Lucas Act claim because of the employment of special plant security personnel at the request of the Field Security Office of the 9th Naval District. This amount was stated *206 at $1,595.44 in plaintiff’s claim of May 17, 1945, which was also an exhibit of the Lucas Act claim. The United States Coast Guard furnished adequate security personnel having a 24-hour security detail on duty at plaintiff’s plant. There is no adequate proof of any request by the contracting officer or of any written request by the 9th Naval District Field Security Office to incur this alleged cost. This was a normal contract expense. Plaintiff had employed a night watchman in South Milwaukee and he was replaced in August 1942 by a seventy-year-old man. This watchman also continued as a watchman after delivery of the boats. Plaintiff’s plant was located along the waterfront in an industrial area. There was no other employee to clean up the office and shop. The claim was denied by the contracting officer on June 14, 1945, without appeal.
28. In requesting payment of $22,713.08, the difference between the cost of the Sterling engines ($43,413.08) and the asserted cost of the Hall-Scott Engines ($20,700), plaintiff agreed that, if its request was approved, plaintiff would absorb losses of over $30,000. No formal request for payment of the $30,000 was ever made.
29. The evidence does not establish that plaintiff’s losses were attributable to any of the causes set forth in its Lucas Act claim. It is not established that any delay by the defendant, in furnishing any approved plan or design, resulted in increased costs to plaintiff.
30. Many factors or circumstances contributed to plaintiff’s losses:
(a) Plaintiff’s finances from February 12 to August 27, 1942, were entirely inadequate for performance of the contract.
(b) Throughout the entire contract period, plaintiff’s officers were without experience in the boatbuilding business and contributed little or nothing to the performance of the contract. Mr. Falk made a sincere effort to insure proper performance of the obligations assumed by those who preceded him. His primary contribution was the advancing of money from his own funds in an effort to see that the undertaking was satisfactorily completed.
*207 (c) Plaintiff’s first superintendent, Mr. Nimphius, was a competent boatbuilder, but without experience in handling the amount of work required by the contract. The annual sales of Nimphius were represented to be $35,000. He operated in South Milwaukee with not over $100 per month of overhead, including rent of only $40 per month, and a wage scale which averaged about $0.60 per hour.
(d) Mr. Friedel, the superintendent, who took over in August of 1942 when Mr. Nimphius left, had no experience as a boatbuilder except that gained as a helper for six months in 1917 or 1918, and under Nimphius after June 15,1942, and was therefore obliged to spend considerable time studying the plans, reorganizing, ordering materials, etc. Under his management and that of Mr. Falk the wage scale increased about 70% to well over $1 per hour. The rent increased to $150 per month at Eacine. Administrative expenses increased to a claimed total of $9,711.55, and indirect costs including overhead items, to a claimed $16,166.61.
(e) Mr. Nimphius’ organization had disintegrated before the work started, his key employees had obtained other work, and he was forced to build up a new organization, consisting of a few experienced men and some young boys who worked after school at night. He left the organization in August 1942.
(f) When Mr. Nimphius left, many of his men also left or were fired and Mr. Friedel was obliged to procure some experienced skilled workmen including four boatbuilders, three of whom did not put in an appearance until December 1942 and January 1943.
(g) After Mr. Nimphius left, plaintiff considered it was without personnel capable of installing the boat engines and had to hire a Hall-Scott engineer to come from California to supervise the installation on the first boat.
(h) It was essential to have a marine electrician but plaintiff had none so a Navy inspector had to instruct plaintiff.
(i) Plaintiff also had no workmen experienced in welding stem tubes, rudders, quadrants, tiller arms, or couplings.
(j) The transfer of plaintiff’s plant from South Milwaukee to Eacine several months after the job was in progress, *208 resulted in loss of work time and extra costs. Plaintiff subsequently had to return to Milwaukee for test runs. It appears that the increased costs could have been largely avoided by remaining in South Milwaukee where launching facilities were available nearby at the South Shore Yacht Club.
(k) Plaintiff’s office manager and purchasing agent (Mr. A. B. Minton) was retained on the payroll by Mr. Falk, at a cost of $1,551.01 until January 31, 1943, when he was released because of financial discrepancies, despite the fact that he contributed little or nothing to the work, was without experience in shipbuilding, was incompetent, and spent very little time on the job.
(l) Plaintiff’s equipment was inadequate throughout the contract period. At the outset plaintiff lacked micrometers, slide rules, woodworking equipment, and operated in makeshift fashion. Plaintiff’s machinery and equipment was valued at $1,180.34 as of July 4,1942. Approximately $3,000 was subsequently expended for machinery, equipment, and small tools, much of which an experienced boatbuilder would have had on hand as necessary to the business.
(m) A large proportion of the bronze castings were defective and were rejected by the Navy Inspectors as defective, causing a delay in the work; many screws and rivets had to be refastened because they were improperly installed or the wrong sizes were used.
(n) The first boat was moved to San Francisco Bay and tested for speed and maneuverability with the understanding that Mr. Falk and his engineer were to accompany the boat at their expense. However, Mr. Falk took four workmen (Anderson, Kotchi, Nesgaard, and Hilgers) and spent $2,157.84 for travel and living expenses, plus over $1,500 for their salaries (Kotchi $350, Nesgaard $275, Hilgers $310, Anderson $742.30). This large expense could have been avoided, or greatly reduced, as the boats were tested near the San Francisco shops of the Hall-Scott Company where the boat was drydocked and Hall-Scott or local labor could have performed all necessary work.
31. The evidence does not establish that plaintiff incurred net losses of $53,167 between September 16,1940, and August *209 15,1945, in the performance of Government contracts within the purview of the Lucas Act and the Regulations issued pursuant thereto by Executive Order No. 9786. The Regulations provided in part as follows:
101.7 The term “cost of performance” means the reasonable and necessary cost to a contractor or subcontractor of work, supplies, or services furnished during the statutory period pursuant to a contract or subcontract, determined in accordance with the accounting practices of the contractor or subcontractor consistently applied during performance of the contract or subcontract, provided such practices accord with recognized commercial accounting practices. Such cost shall include, to the extent reasonable and necessary, direct costs and a properly allocable proportion of indirect costs, but shall not include the following items:
*****
1). Unreasonable compensation paid to officers or employees, including any compensation in excess of wages or salaries approved under applicable wage and salary stabilization regulations; bonuses which constitute a distribution of profits; and royalties paid to officers and employees.
*****
d. Cost of unreasonable spoilage or defective work and excessive inventories of materials and supplies.
e. Entertainment expenses. *****
j. Cost or losses arising from fraud or wilful misconduct of any officer, employee, or agent, or negligence of any officer, of the contractor or subcontractor.
* Hi * Hs *
n. Any item of cost which the contract or subcontract or negotiations therefor expressly contemplated would not be reimbursed or compensated or allowed for.
The evidence fails to establish that $98,944.65 represents the reasonable and necessary costs of performing the contract involved in this action.
This cost figure fails to exclude any of the compensation paid for incompetent management in the early stages of the contract, cost of defective work, the excess cost of a California trip, which plaintiff also expressly agreed to bear during the January 1943 negotiations, and costs or losses, if any, *210 arising from the misrepresentation of plaintiff’s first president as to plaintiff’s financial resources.
Legal, accounting, and auditing fees of $2,224.76, most of which were incurred after July 4, 1942, were due in large measure to the lack of an efficient organization, proper management and the necessity of setting up a bookkeeping system.
Plaintiff’s claimed costs of performance start with the organization of plaintiff on July 16, 1941, rather than from February 7 or 12,1942, when performance of the contract was initiated. The costs of bidding on other work and of several trips to Washington, D. C., to obtain contracts at a cost of $1,566.89 are not excluded. Plaintiff also sold some of the equipment and materials to Mr. Friedel for about $2,000 for which no deduction was made in the Lucas Act claim.
32. The documents relied upon by the plaintiff to establish that claims filed prior to August 15, 1945, apprised the Department of the Navy it was being asked for extra legal relief under the First War Powers Act, and met the requirements of the Lucas Act (Public Law 657, 79th Congress, 60 Stat. 902) included the following:
(1) A statement of the amount claimed submitted in January 1947 showing in detail the cost of performance of the contract and the claimed loss sustained thereunder during the period December 1,1941, to May 8,1943.
(2) Invoices submitted by the plaintiff under date of July 24,1943, with supporting details.
(3) A Navy Department Eeport of the meeting between plaintiff and the representatives of the Department of the Navy on September 7, 1943, at which meeting the claims were discussed.
(4) Plaintiff’s letter of September 20, 1943, to the Navy Department pointing out that no payment on the contract had been received and insisting upon a partial payment.
(5) A statement of the amount considered by the Office of the Supervisor of Shipbuilding, Navy Department, to be due m final settlement of the subject contract dated December 3,1943.
(6) Plaintiff’s counter proposal to the above statement of December 3,1943, dated February 18,1944.
*211 (7) Letter from Otto H. Falk, Jr., to the Secretary of the Navy dated June 10,1944, as follows:
Dear Mr. Secretary : I am pleased to reply at your request of our phone conversation of Saturday June 10th regarding the contract of the Milwaukee Engineering & Shipbuilding Co., contract number NOs 99019. I feel that due to the many changes made by the Bureau of Ships during the building period, particularly on the lines and engines, that we are only asking for less than a fair amount of the cost. The company, is requesting a sum of $64,933.08, the Navy wants to pay $36,004.80, our costs to build these boats was in excess of $90,000.00.
In fairness to this company, not having received any additional contracts since these boats were delivered in May 1943, and the excellent reports and records these boats have made, I believe that they have been overlooked in furthering the efforts to win the war, as the records show we turned out excellent boats.
This contract was obtained by a political coup, with no equipment or knowledge of the boatbuilding business, which caused considerable delay in construction progress. When the Navy became so discouraged that they wanted to lift the contract, which was about the time I came into the company, I stepped in to take over completely and guaranteed the Navy that I personally would complete and finance this contract. This meaning my leaving a very fine manager’s position with the Allis-Chalmers Co. at a great loss in personal remuneration and also has taken up a great deal of my time as one of owner and director of the Falk Corp.
I should personally be very pleased to assist in any action that may be necessary to help clarify this matter.
I shall be very much interested in your personal advice and comment in this regard.
Very respectfully,
Otto H. Falk, Jr.,

President.

(8) Reply to Mr. Falk from the Secretary of the Navy dated July 5, 1944. (finding 20)
(9) Statement of Account submitted by plaintiff dated May 17,1945, showing “amount due in Final Settlement under Fixed Price Contracts and Fixed Price Contracts containing Labor and Material Adjustment Clauses.” (finding 20)
(10) Proposed settlement from the Bureau of Supplies and Accounts dated June 14,1945.
*212 (11) Plaintiff’s response to the proposed settlement referred to above dated June 28,1945.[8] (finding 20)
33. Prior to the time that Otto H. Falk, Jr., obtained control of the company and added financial stability to the organization, it cannot be said that the loss incurred in the performance of this contract was without fault or negligence on the part of the plaintiff. The record is replete with evidence of mismanagement, lack of a properly organized and equipped setup, insufficient funds for undertaking a contract of this kind and, particularly after Mr. Nimphius left the firm, a general lack of familiarity of the business of shipbuilding on the part of officers and employees of the firm.
dependant’s counterclaim
34. Plaintiff engaged in a protracted controversy with the Department of the Navy over the settlement of this contract commencing in May 1943. In the course of presenting its claims plaintiff was called upon to furnish breakdowns of estimated costs and to assemble complete information to substantiate such costs. On July 5, 1944, the Secretary of the Navy, in response to Mr. Falk’s personal appeal, ruled that “the contract price should be increased only to the extent necessary to cover the change in lines, if substantiated.” On March 21, 1945, the Assistant Supervisor of Shipbuilding informed plaintiff that the Navy “has been anticipating the receipt of a cost breakdown in regard to changes in vessel lines” and inquired if such a breakdown was to be submitted.
35. On May 17, 1945, plaintiff submitted to the Navy Department, Bureau of Supplies and Accounts, a detailed claim, including an elaborate breakdown on the cost of the “changes in lines” of the aircraft rescue boats under Bureau of Ships plan 481114 as revised by plan 502304 and later revised by plan 509160. Plaintiff represented that between February 8, 1942, and March 26,1942, it had expended $2,912.37 for this purpose including $1,245.20 for labor, $621.20 for material, and $1,045.97 for overhead.
*213 36. The contracting officer, the Purchasing Officer of the Bureau of Supplies and Accounts, accepted what was subsequently shown to be plaintiff’s erroneous representations and allowed this claimed cost of $2,912.37 in its entirety in a proposed settlement of $40,277.65 dated June 14, 1945, $26,957.04 of which had been paid in a preliminary settlement dated November 11,1943.
After plaintiff instituted its Lucas Act suit in the District Court of the United States for the District of Columbia, plaintiff requested payment of the balance of the $40,277.65 or $13,320.61. Under date of April 4, 1949, the General Accounting Office at plaintiff’s request issued Certificate No. 1735010 to the Secretary of the Treasury certifying that plaintiff was due said sum of $13,320.61, and said sum was paid on July 12, 1949, by check No. 29498 of the Treasurer of the United States.
37. Plaintiff did not in fact expend $1,245.20 for labor, $621.20 for material, and $1,045.97 for overhead prior to March 27,1942, as represented, or any part thereof as represented, and these facts were clearly evident from the plaintiff’s records at the time the claim was prepared. Plaintiff did not lay any lines under plans NOs. 481114 or 502304 but only under revised plan No. 509160.
Plaintiff’s total expenditures for labor prior to March 27, 1942, as reflected by its books of account and cancelled checks were only $522.80 and were for other purposes, such as cleaning up the shop, making skids, and new benches, removing the furnace, relocating the machinery, and perhaps making battery boxes. Prior to March 27, 1942, plaintiff did not have, as claimed, any key men on its payroll, either idle or working.
Plaintiff’s records do not disclose that, as of the periods in question, plaintiff expended $621.20 for materials including $605.70 for plywood and spruce in laying lines under plans 481114 and 502304 prior to March 27,1942. Plaintiff’s invoices and its purchase order books do not show that any plywood or spruce was purchased prior to April, 8, 1942.
Plaintiff’s available records do not show that any spruce for laying the lines was ordered, received or in stock prior to March 27,1942. The first spruce used in laying the lines *214 was received April 24, 1942. Neither do the records show that any plywood had been acquired or used for lines and bulkheads prior to March 27,1942.
Plaintiff’s claimed overhead of $1,045.97 was computed at 84% of the purported direct labor costs of $1,245.20. No overhead was incurred in relaying lines under plans NOs. 481114 and 502304 as represented. The evidence shows that plaintiff’s entire overhead for this period did not exceed $100 per month.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover, and the petition is therefore dismissed.
The court further concludes that as a matter of law the defendant is entitled to recover on its counterclaim, and it is therefore adjudged and ordered that it recover of and from the plaintiff two thousand nine hundred twelve dollars and thirty-seven cents ($2,912.37) together with interest thereon at the rate of four percent per annum from September 4,1952, to date of payment. !

 In its reply brief, plaintiff suggests that if its Lucas Act claim is invalid, it has a claim in the same amount for breach of contract. We do not consider this argument, which was not raised either by the pleadings or during the trial of the case.

 Nimphius, who was in charge of actual construction of the boats until this time, had been forced to build up a new organization, as most of his key employees had obtained other jobs prior to the award of the instant contract. He was able to recruit a few experienced men, but had to operate largely with new and inexperienced help.

 Fait anticipated that any losses which occurred on this contract would be recouped on future government contracts.

‘The contract specifications called for matched pairs of Sterling engines, consisting of a right-hand and a left-hand engine.

 A matched pair of engines consists of a right-hand and a left-hand engine. The bid specifications required a matched pair of engines. Cf. finding 1R.

 The contract specifications called for a matched pair of Sterling engines.

 $13,320.61 was subsequently paid.

 As stated In finding 20, plaintiff contends that this response, when considered in the light of all the documents listed, constitutes its request for relief.